THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        and<br><br>THE LOUISIANA DEPARTMENT OF<br>ENVIRONMENTAL QUALITY,<br><br>        and<br><br>THE STATE OF TEXAS,<br><br>        Plaintiffs,<br><br>        v.<br><br>SID RICHARDSON CARBON, LTD.,<br><br>        Defendant. | Civil Action No.  3:17-CV-1792 |

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), the Louisiana Department of Environmental Quality ("LDEQ"), with the concurrence of the Louisiana Attorney General, and the State of Texas ("Texas"), by and through the Attorney General of Texas, acting on behalf of the Texas Commission on Environmental Quality ("TCEQ"), allege:

## NATURE OF THE ACTION

1.     This is a civil action brought against Sid Richardson Carbon, Ltd. pursuant to Sections 113(b), 167, and 304 of the Clean Air Act ("the Act" or "CAA"), 42 U.S.C. § 7413(b), 7477, and 7604 for injunctive relief and the assessment of civil penalties for

violations of the following statutory and regulatory provisions: (1) the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-92; (2) the Nonattainment New Source Review ("NNSR") provisions of the Act, 42 U.S.C. §§ 7501-7515; (3) the federally approved and enforceable Louisiana and Texas PSD and NNSR regulations set forth in the Louisiana and Texas State Implementation Plans ("SIPs"); (4) Title V of the Act, 42 U.S.C. §§ 7661-7661f and the federally approved Texas Title V program, including certain operating permit requirements; and (5) the National Emission Standards for Hazardous Air Pollutants ("NESHAP") provisions of the Act, 42 U.S.C. § 7412, 40 C.F.R. Part 63, Subpart YY.

2.      The violations occurred at Defendant's carbon black manufacturing facilities located at 5221 Sid Richardson Road, Addis, Louisiana 70710 ("Addis Facility"), 1211 N. Midway Road, Big Spring, Texas 79720 ("Big Spring Facility"), and 9455 FM 1559, Borger, Texas 79007 ("Borger Facility") (collectively, "the Facilities").  Defendant is engaged in the manufacture of carbon black at each of the Facilities, primarily for the sale to and later use by the tire manufacturing industry.  Carbon black is a material primarily composed of elemental carbon that is used in the manufacture of pigment and as a reinforcing filler in rubber products, including tires.

3.      Defendant is responsible for the modification and operation of their Addis Facility, where it failed to comply with the Act's implementing regulations and the Louisiana SIP by: (1) failing to obtain appropriate permits authorizing major modifications to the Addis Facility; and (2) failing to install and continuously operate the appropriate pollution

control technology to control emissions of nitrogen oxides ("NO$_x$"), sulfur dioxide ("SO$_2$"), and/or particulate matter ("PM").

4.      Defendant is responsible for the modification and operation of their Big Spring Facility, where it failed to comply with the Act's implementing regulations and the Texas SIP by (1) failing to obtain appropriate permits authorizing major modifications to the Big Spring Facility; and (2) failing to install and continuously operate the best available control technology ("BACT") to control emissions of NO$_x$, SO$_2$ and/or PM.

5.      Defendant is responsible for the modification and operation of their Borger Facility, where it failed to comply with the Act's implementing regulations and the Texas SIP by (1) failing to obtain appropriate permits authorizing major modifications to the Borger Facility; (2) failing to install and continuously operate BACT to control emissions of NO$_x$, SO$_2$, and/or PM; (3) failing to comply with certain provisions of the applicable permits, and (4) failing to comply with the applicable emission standards promulgated under Section 112 of the Act, 42 U.S.C. § 7412, known as the NESHAP for Source Categories, which include maximum achievable control technology ("MACT") standards, and Subpart YY of the NESHAPs, codified at 40 C.F.R. § 63.1103.

6.      As a result of Defendant's continued operation of their Facilities, in the absence of appropriate controls, NO$_x$, SO$_2$, PM and/or certain Hazardous Air Pollutants ("HAPs") have been released into the atmosphere, and, upon information and belief, will continue to be released in violation of the Act.  These pollutants cause harm to human health and the environment once emitted into the air, including premature death, heart attacks, respiratory problems and adverse environmental effects.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction of the subject matter of this action pursuant to Sections 113(b), 167, and 304 of the Act, 42 U.S.C. §§ 7413(b), 7477, and 7604, and pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367(a).  This Court has personal jurisdiction over the Defendant, which does business in the State of Louisiana and in this judicial District.

8.     Venue is proper in this District pursuant to Sections 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b), (c), and 1395(a), because violations occurred and are occurring in this District, and one of the three facilities at issue is operated by the Defendant in this District.

## AUTHORITY

9.     Authority to bring this action is vested in the Attorney General of the United States pursuant to Section 305 of the Act, 42 U.S.C. § 7605, and pursuant to 28 U.S.C. §§ 516 and 519.  The authority of the LDEQ to bring this action, with the concurrence of the Louisiana Attorney General, derives from the CAA and La. R.S. 30:2025(A).  The authority of the Texas Attorney General to bring this action in the name of the State of Texas on behalf of the TCEQ derives from the CAA, Chapter 382 of the Texas Health and Safety Code ("Texas Clean Air Act"), and Sections 7.032, 7.101, and 7.105 of the Texas Water Code.

## NOTICES

10.     Notice of the violations underlying this action was provided to the Defendant at least 30 days prior to the filing of this Complaint pursuant to Section 113(a)(1) of the CAA, 42 U.S.C. § 7413(a)(1).  Notice of the commencement of this action was provided to

the States of Louisiana and Texas, pursuant to Sections 113(a)(1) and (b) of the CAA,

42 U.S.C. §§ 7413(a)(1) and (b).

11.    The 30-day period established in 42 U.S.C. § 7413, between issuance of

the notices of violation and commencement of a civil action, has elapsed.

## THE DEFENDANT

12.    Sid Richardson Carbon, Ltd. is a Texas limited partnership Defendant is,

and was at all times relevant to this Complaint, the owner and/or operator of the Facilities.

13.    For purposes of Section 113(b) of the Act, 42 U.S.C. § 7413(b),

Defendant is, and has been at all times relevant to the present action, a "person" as defined in

Section 302(e) of the Act, 42 U.S.C. § 7602(e), and the applicable federal and state regulations.

## STATUTORY AND REGULATORY BACKGROUND

14.    The Clean Air Act is designed to protect and enhance the quality of the

nation's air so as to promote the public health and welfare and the productive capacity of its

population.  Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1).

### The National Ambient Air Quality Standards

15.    Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator of

the EPA to promulgate regulations establishing primary and secondary national ambient air

quality standards ("NAAQS") for those air pollutants ("criteria pollutants") for which air

quality criteria have been issued pursuant to Section 108 of the Act, 42 U.S.C. § 7408.  The

primary NAAQS are to be adequate to protect the public health with an adequate margin of

safety, and the secondary NAAQS are to be adequate to protect the public welfare from any

5

known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

16.     Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  An area that meets the NAAQS for a particular pollutant is termed an "attainment" area.  An area that does not meet the NAAQS is termed a "nonattainment" area. An area that cannot be classified due to insufficient data is termed "unclassifiable" but is considered "attainment" for NSR purposes.

17.     At all times relevant to this Complaint, including from 1992 through 2016 (except for 2011), West Baton Rouge Parish, Louisiana, where the Addis Facility is located, was classified as "nonattainment" for the NAAQS for ozone.   In 2017, West Baton Rouge Parish, Louisiana was re-designated as "attainment" for ozone.  The pollutant, $NO_x$, is a known precursor to ozone. 40 C.F.R. § 51.165(a)(1)(xxxvii).  At all times relevant to this Complaint, West Baton Rouge Parish, Louisiana, was "unclassifiable/attainment" for the NAAQS for both $SO_2$ and PM.

18.     At all times relevant to this Complaint, Hutchinson County, Texas, where the Borger Facility is located, and Howard County, Texas, where the Big Spring Facility is located, have been classified as "unclassifiable/attainment" for the NAAQS for each of the pollutants relevant here: i.e., ozone, $SO_2$ and PM.

19.     Pursuant to Section 110 of the CAA, 42 U.S.C. § 7410, states adopt and submit to EPA for approval rules for the attainment and maintenance of the NAAQS.  After

such provisions are approved by EPA, these provisions constitute a state's "applicable

implementation plan," within the meaning of Sections 113(b) and 302(q) of the CAA, 42

U.S.C. §§ 7413(b) and 7602(q), and are considered the SIP.  These SIPs are enforceable by the

respective states in which they are adopted and, pursuant to Section 113(b) of the CAA, 42

U.S.C. § 7413(b), by the United States.

      20.    The States of Louisiana and Texas have adopted SIPs that have been

approved by EPA.  40 C.F.R. Part 52, Subparts T and SS.

      21.    Of relevance to this Complaint, Section 110(a)(2)(C) of the CAA, 42

U.S.C.§ 7410(a)(2)(C), requires each SIP to include, *inter alia*, "regulation of the modification

and construction of any stationary source within the areas covered by the plan as necessary to

assure that national ambient air quality standards are achieved, including a permit program as

required in parts C and D of this subchapter [Subchapter I of the CAA]."

**The Prevention of Significant Deterioration Requirements**

**a.**    **Overview**

      22.    Part C of the Act, 42 U.S.C. §§ 7470-7492, sets forth New Source

Review requirements for areas designated as either "attainment" or "unclassifiable" for

purposes of meeting the NAAQS.  These requirements are designed to prevent the significant

deterioration of air quality in those areas, protect public health and welfare, assure that

economic growth will occur in a manner consistent with the preservation of existing clean air

resources, and assure that any decision to permit increased air pollution is made only after

careful evaluation of all the consequences of such a decision and after public participation in

7

the decision making process.  42 U.S.C. § 7470.  These provisions are referred to herein as the "PSD program."

23.     Section 165(a) of the Act, 42 U.S.C. § 7475(a), among other things, prohibits the construction and operation of a "major emitting facility" in an area designated as attainment or unclassifiable unless a permit has been issued that comports with the requirements of Section 165 and the facility is subject to BACT for each pollutant subject to regulation under the Act that is emitted from the facility.

24.     Section 169(1) of the Act, 42 U.S.C. § 7479(1), designates carbon black plants (furnace process) that emit or have the potential to emit 100 tons per year or more of any air pollutant to be "major emitting facilities."

25.     Section 169(2) of the Act, 42 U.S.C. § 7479(2), defines "construction" as including "modification" (as defined in Section 111(a) of the Act).  "Modification" is defined in Section 111(a) of the Act, 42 U.S.C. § 7411(a), to be "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."

26.     EPA promulgated regulations to implement the PSD program.  These regulations are found at 40 C.F.R. § 52.21 and 40 C.F.R. § 51.166 and are referred to as the "PSD regulations."

27.     The PSD regulations define "major modification" as "any physical change in or change in the method of operation of a major stationary source that would result in: a

significant net emission increase" of any pollutant subject to regulation under the Act.  40 C.F.R. § 52.21(b)(2)(i).

28.     The PSD regulations define "net emissions increase" as "the amount by which the sum of the following exceeds zero: (a) the increase in emissions from a particular physical change or change in method of operation at a stationary source . . . and (b) any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable."  40 C.F.R. § 52.21(b)(3).

29.     The PSD regulations set individual thresholds for each criteria pollutant that define whether a net emissions increase of a pollutant is "significant."  *See* 40 C.F.R. § 52.21(b)(23)(i).

**b.     PSD Programs in Louisiana and Texas**

30.     Section 161 of the Act, 42 U.S.C. § 7471, requires that each applicable SIP contain a PSD program.  A state may comply with this section of the Act by having its own PSD regulations approved by EPA as part of its SIP, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166.

31.     EPA approved Louisiana's PSD program, which provides for the state's issuance and enforcement of permits to prevent the significant deterioration of air quality, in a federally enforceable SIP, effective May 26, 1987.  52 Fed. Reg. 13671 (April 24, 1987).  Since then, EPA has approved subsequent revisions to Louisiana's PSD regulations.  40 C.F.R. §§ 52.970(c) and 52.999(c).  The PSD program in the Louisiana SIP is codified at LAC 33:III.509.

32.     On June 24, 1992, EPA approved Texas's PSD program (57 Fed. Reg. 28093), and has approved subsequent revisions to these regulations since that date (*see e.g.*, 62

Fed. Reg. 44083 (Aug. 19, 1997); 69 Fed. Reg. 43752 (July 22, 2004)).  40 C.F.R.

§§ 52.2270(c), 52.2299(c), and 52.2303.  The Texas PSD program is codified at 30 Texas

Administrative Code ("TAC") §§ 116.12, 116.160.

     33.     These applicable PSD regulations in the Texas and Louisiana SIPs have,

at all relevant times, prohibited construction and operation of a major modification at a major

stationary source without, among other things, obtaining a PSD permit, undergoing a BACT

determination, and applying BACT pursuant to such determination for each relevant pollutant.

     34.     Under the Louisiana and Texas SIPs and the applicable federal PSD

regulations, the term "major modification" is defined to include any physical change in or

change in the method of operation of a major stationary source that would result in a significant

net emissions increase of a regulated NSR pollutant.  *See* 40 C.F.R. § 52.21(b)(2)(i); LAC

33:III.509.B; 30 TAC §§ 116.12, 116.160.

     35.     Under the Louisiana and Texas SIPs and the applicable federal PSD

regulations, the term "net emissions increase" means "the amount by which the sum of the

following exceeds zero: (a) [t]he increase in emissions from a particular physical change or

change in the method of operation at a stationary source . . . ; and (b) [a]ny other increases and

decreases in actual emissions at the source that are contemporaneous with the particular change

and are otherwise creditable."  40 C.F.R. § 52.21(b)(3)(i); LAC 33:III.509.B; and 30 TAC

§§ 116.12, 116.160.

     36.     Under the Louisiana and Texas SIPs and the applicable, federal PSD

regulations, such an increase is "significant" if it exceeds the significance threshold for the

pollutant at issue.  The relevant significance thresholds in this case are: 40 tons per year of $SO_2$

or NO$_x$ and 25 tons per year of PM.  40 C.F.R. § 52.21(b)(23)(i); LAC 33:III.509.B; and 30

TAC §§ 116.12, 116.160.  Effective July 15, 2008, SO$_2$ is also regulated as a precursor to

PM$_{2.5}$.  73 Fed. Reg. 28321, 28327-28 (May16, 2008).

   37. The owner or operator of the major stationary source proposing a major

modification must, among other things, demonstrate that the proposed facility "will apply the

best available control technology [BACT] . . . [.]"  LAC 33:III.509.J; 30 TAC

§§ 116.111(a)(2)(C), 116.160(c)(1)(A).

   38. Pursuant to the Louisiana and Texas SIPs, before any actual work is

begun on a major modification of a major stationary source, the source owner or operator is

required to obtain a New Source Review permit.  LAC 33:III.509.I, 517; 30 TAC

§§ 116.110(a)(1), 116.111, 116.160 and 40 C.F.R. § 52.21.

   **The Nonattainment New Source Review Requirements**

   39. Part D of Title I of the Act, 42 U.S.C. §§ 7501-7515, sets forth

provisions for New Source Review requirements for areas that are designated as

"nonattainment" for purposes of meeting one or more of the NAAQS standards

("Nonattainment NSR" provisions).  The Nonattainment NSR provisions are intended to reduce

emissions of air pollutants in areas that have not met the NAAQS so that the areas make

progress toward meeting the NAAQS.

   40. Under Section 172(c)(5) of Act, 42 U.S.C. § 7502(c)(5), a state is

required to adopt Nonattainment NSR SIP rules that include provisions that require that all

permits for the construction and operation of modified major stationary sources within

nonattainment areas conform to the requirements of Section 173 of the CAA, 42 U.S.C. § 7503.

Section 173 of the CAA, in turn, sets forth a series of requirements for the issuance of permits for major modifications to major stationary sources within nonattainment areas.  42 U.S.C. § 7503.

41.    EPA approved Louisiana's Nonattainment NSR permit program in a federally enforceable SIP, effective November 10, 1997.  62 Fed. Reg. 52948 (Oct. 10, 1997). Since then, EPA has approved subsequent revisions to Louisiana's NNSR regulations (*see*, *e.g.*, 67 Fed. Reg. 61260 (Sept. 30, 2002); 80 Fed. Reg. 68451 (Nov. 5, 2015); 81 Fed. Reg. 51341 (Aug. 4, 2016); 40 C.F.R. §§ 52.970(c) and 52.999(c).  The NNSR program in the Louisiana SIP is codified at LAC 33:III.504.

42.    Section 173 of the Act, 42 U.S.C. § 7503, and LAC 33:III.504 provide that construction and operating permits for a major modification in a nonattainment area may only be issued if, inter alia, (a) sufficient offsetting emission reductions have been obtained to reduce existing emissions to the point where reasonable further progress towards meeting the NAAQS is made; and (b) the pollution controls to be employed will reduce emissions to the lowest achievable emission rate ("LAER").

43.    "Major modification" is defined in LAC 33:III.504K as "any physical change or change in the method of operation that would result in a significant net increase . . . of any regulated pollutant for which the stationary source is already major."

44.    "Net emissions increase" means the amount by which the sum of the following exceeds zero: (a) any increase in actual emissions from a particular physical change or change in the method of operation at a stationary source; and (b) any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change

12

and are otherwise creditable as calculated under the applicable rules.  LAC 33:III.504K.  A "significant" net emissions increase means an increase in the rate of emissions that would equal or exceed any of the following rates for the following pollutants:  40 tons per year of $SO_2$; 40 tons per year of $NO_x$; and 25 tons per year of PM.  LAC 33:III.504K.

45.     LAER is defined, in pertinent part, as "the most stringent emissions limitation which is contained in [any SIP] for such class or category of major stationary source, unless . . . the proposed stationary source demonstrates that such limitations are not achievable, or . . . that is achieved in practice by such class or category of stationary source," whichever is more stringent.  42 U.S.C. § 7501(3); LAC 33:III.504K.

46.     Though Nonattainment NSR is a preconstruction permitting program, the Act, its implementing regulations, and the Louisiana Nonattainment NSR rules establish requirements for the lawful operation of the source following a modification.

47.     EPA is authorized to enforce violations of Texas's and Louisiana's federally approved PSD and NNSR programs, as well as violations of permits issued pursuant to those programs.  42 U.S.C. § 7413(b); 40 C.F.R. § 52.23.

**National Emission Standards for Hazardous Air Pollutants ("NESHAPs")**

48.     Through the Clean Air Act Amendments of 1990, Congress established a list of 188 hazardous air pollutants believed to cause adverse health or environmental effects, 42 U.S.C. § 7412(b)(1), and directed EPA to publish a list of all "categories and subcategories" of "major sources" of hazardous air pollutants ("HAPs").  42 U.S.C. § 7412(c).

49.     "Major source" is defined as any "stationary source or group of stationary sources located within a contiguous area and under common control that emits or has

the potential to emit considering controls, in the aggregate, 10 tons per year or more of any

[HAP] or 25 tons per year or more of any combination of [HAPs]."  42 U.S.C. § 7412(a)(1).

50.     A "stationary source" is defined as any building, structure, facility, or

installation which emits or may emit any air pollutant.  42 U.S.C. § 7412(a)(3) (stating that

"stationary source" under Section 112(a) has the same meaning as that term has under

Section 111(a) of the CAA, 42 U.S.C. § 7411(a)(3)).

51.     Congress directed EPA to promulgate regulations establishing emission

standards for each category or subcategory of major sources of HAPs listed.  42 U.S.C.

§ 7412(d)(1).  These emission standards must require the maximum degree of reduction in

emissions of HAPs that the Administrator, taking into consideration the cost of achieving such

emission reduction, and any non-air quality health and environmental impacts and energy

requirements, determines is achievable for the new or existing sources in the category or

subcategory to which the emission standard applies.  42 U.S.C. § 7412(d)(2).

52.     The emission standards promulgated under Section 112 of the Act, 42

U.S.C. § 7412, are known as the National Emission Standards for Hazardous Air Pollutants

("NESHAPs") for Source Categories or "MACT" ("maximum achievable control technology")

standards.  These emission standards are found in Part 63 of Title 40 of the Code of Federal

Regulations.

53.     After the effective date of any emission standard, limitation, or

regulation promulgated pursuant to Section 112, no person may operate a source in violation of

such standard, limitation, or regulation.  42 U.S.C. § 7412(i)(3).

14

54.     Pursuant to Section 112(c) of the Act, 42 U.S.C. § 7412(c), EPA identified carbon black production as a source category of HAPs.  61 Fed. Reg. 28197-98 (June 4, 1996).  EPA also promulgated standards for carbon black production pursuant to Section 112(d) of the Act, 42 U.S.C. § 7412(d), that subjects carbon black production to the Generic MACT standard set forth in 40 C.F.R. Part 63, Subpart YY.  67 Fed. Reg. 46258-59 (July 12, 2002).

55.     The provisions of Subpart YY of Part 63 apply to source categories and affected sources specified in § 63.1103(a) through (h), including carbon black production facilities, as specified in 40 C.F.R. § 63.1103(f).

56.     The provisions of 40 C.F.R. § 63.1103(f) set forth applicability, definitions, and control requirements for carbon black production facilities, including main unit filter process vents.  Pursuant to Table 8 to § 63.1103(f), owners and operators of a carbon black production main unit filter process vent must meet specified emission reduction requirements if the HAP concentration of the emissions stream is equal to or greater than 260 parts per million by volume.  Subpart YY also includes standards for owners or operators of such process vents to calculate the HAP concentration of the emissions streams to determine applicability of the control requirements.  40 C.F.R. § 63.1104.

**The Clean Air Act Title V Program**

57.     Title V of the Act, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain sources, including "major sources."  The purpose of Title V is to ensure that all "applicable requirements" for compliance with the Act, including PSD and NNSR requirements, are collected in one place.

15

58.     A "major source" for purposes of Title V is defined, among other things, as a source with a potential to emit greater than 100 tons per year of any criteria pollutant.  42 U.S.C. §§ 7661(2), 7602.

59.     EPA first promulgated regulations governing state operating permit programs on July 21, 1992.  57 Fed. Reg. 32,295; 40 C.F.R. Part 70.

60.     EPA approved Texas's Title V program on December 6, 2001 (66 Fed. Reg. 63318).  Texas's Title V operating permit program is codified at 30 TAC Chapter 122.

61.     In all respects relevant to this Complaint, the Title V regulations of Texas closely mirrors the federal Title V regulations codified at 40 C.F.R. Part 70.

62.     Section 502(a) of the Act, 42 U.S.C. § 7661a(a), and the Texas Title V operating permit programs have, at all relevant times, made it unlawful for any person to violate any requirement of a permit issued under Title V, or to operate a Part 70 source except in compliance with a permit issued by a permitting authority under Title V.

63.     Section 504(a) of the Act, 42 U.S.C. § 7661c(a), implementing regulations of the Act, 40 C.F.R. Part 70, and the Texas Title V operating permit program regulations have, at all relevant times, required that each Title V permit include, among other things, enforceable emission limitations (commonly set forth in a Maximum Allowable Emission Rate Table "MAERT").

64.     The Texas Title V operating permit program regulations require that a source submit a timely and complete permit application that identifies all applicable requirements, certifies compliance with all applicable requirements, and contains a compliance

plan for all applicable requirements for which the source is not in compliance.  30 TAC 122, Subchapter B, Division 3.

65.     The Texas Title V operating permit program regulations require that any permit issued must incorporate all federally applicable requirements.  30 TAC 122.142(b)(2)(A).

66.     Federal regulations at 40 C.F.R. § 70.5(b), and the Texas Title V regulations at 30 TAC § 122.136(b), require any applicant who fails to submit any relevant fact or who has submitted incorrect information in a permit application to promptly submit such supplementary facts or corrected information upon becoming aware of such failure or incorrect submittal.

67.     All terms and conditions of a Title V permit are enforceable by EPA.  42 U.S.C. § 7413(b); 40 C.F.R. § 70.6(b).

## ENFORCEMENT PROVISIONS

68.     Sections 113(a)(1) and (3) of the Act, 42 U.S.C. § 7413(a)(1) and (3), provide that EPA may bring a civil action in accordance with Section 113(b) of the Act whenever it finds that any person has violated or is in violation of any requirement or prohibition of, inter alia, the PSD and NNSR provisions of the Act, the Title V provisions of the Act, the NESHAP/MACT regulations, the Louisiana or Texas SIP, or any permit or regulation issued thereunder.

69.     Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes EPA to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of up to $32,500 for each day of violation occurring on or after March 1, 2008 and up to

17

and including January 12, 2009; $37,500 per day for each violation occurring on or after January 13, 2009 and up to and including November 2, 2015; and $95,284 per day for each violation occurring after November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, 40 C.F.R. § 19.4, and 82 Fed. Reg. 3633 (Jan. 12, 2017), against any person whenever such person has violated, or is in violation of, inter alia, the requirements or prohibitions described in the preceding paragraph.

70.     Section 167 of the Act, 42 U.S.C. § 7477, authorizes EPA to initiate an action for injunctive relief, as necessary to prevent the construction or modification of a major emitting facility which does not conform to the PSD or NNSR requirements in Part C or Part D of the Act.

71.     40 C.F.R. § 52.23 provides that any failure by a person to comply with any provision of 40 C.F.R. Part 52, or with any approved regulatory provision of a SIP, shall render such person in violation of the applicable SIP, and subject to enforcement action pursuant to Section 113 of the Act, 42 U.S.C. § 7413.

72.     Pursuant to La. R.S. 30:2025 the LDEQ may seek injunctive relief and civil penalties for violations of the Louisiana SIP.  La. R.S. 30:2025 authorizes the LDEQ to seek a civil penalty of not more than the cost to the state of any response action made necessary by these violations which is not voluntarily paid by the violator, and a penalty of not more than $32,500 for each day of violation, and if it is established that any violation was done intentionally, willfully, or knowingly, or resulted in a discharge or disposal which caused irreparable or severe damage to the environment or if the substance discharged is one which

18

endangers human life or health, defendant may be liable for an additional penalty of not more than $1,000,000.  The LDEQ is entitled to injunctive relief without the requisite showing of irreparable injury when the conduct sought to be restrained is unconstitutional or unlawful, *i.e.*, when the conduct sought to be enjoined constitutes a direct violation of a prohibitory law and/or a violation of a constitutional right. *Jurisich v. Jenkins*, 749 So. 2d 597 (La. 1999).

73.    Pursuant to the Texas Clean Air Act and Chapter 7 of the Texas Water Code, the State of Texas may seek injunctive relief and civil penalties for violations of the Texas SIP.  Section 382.085(b) of the Texas Health and Safety Code provides that no person may cause, suffer, allow, or permit the emission of any air contaminant or the performance of any activity in violation of the Texas Clean Air Act or of any TCEQ rule or order.  Sections 7.032 and 7.105 of the Texas Water Code authorize the Attorney General of Texas, at the request of the TCEQ, to bring an action for injunctive relief and/or civil penalties if it appears that a violation or threat of a violation of a statute within the TCEQ's jurisdiction, or a rule adopted or an order or a permit issued under such a statute, has occurred or is about to occur. Section 7.101 of the Texas Water Code states that no person may cause, suffer, allow, or permit any violation of a statute within the TCEQ's jurisdiction or a rule adopted or an order or permit issued under such a statute.  Pursuant to Section 7.102 of the Texas Water Code, a person who causes, suffers, allows, or permits such a violation shall be assessed for each violation a civil penalty not less than $50 nor greater than $25,000 for each day of each violation.  Pursuant to Section 7.108 of the Texas Water Code, Texas is entitled to recover its reasonable attorney's fees, court costs, and reasonable investigative fees.

## GENERAL ALLEGATIONS

74.     Paragraphs 1 through 73 are re-alleged and incorporated herein by reference.

75.     At the Addis Facility, Defendant operates three carbon black units (Units 1-3).

76.     At the Big Spring Facility, Defendant operates three carbon black units (Units 1-3).

77.     At the Borger Facility, Defendant operates four carbon black units (Units 1-4).

78.     The Addis, Big Spring and Borger Facilities are owned and operated by Defendant and are engaged in the manufacture of carbon black.  The Facilities were owned and operated by Defendant at all times relevant to this Complaint.

79.     At each of the Facilities, Defendant produces carbon black by subjecting heavy residual oil feedstock to extremely high temperatures in a controlled combustion process. In this process, Defendant partially combusts the oil feedstock in a low oxygen reactor, producing solid carbon particles that are recovered as the carbon black product.  The carbon black product is then dried, pelletized, and packaged.

80.     At all times relevant to this Complaint, the Addis Facility was a "major stationary source," a "major emitting facility," and a "major source," within the meaning of the Act and the applicable PSD and NNSR regulations in the Louisiana SIP, for $NO_x$, $SO_2$ and/or PM because the Addis Facility is a carbon black plant that emits or has the potential to emit in excess of 100 tons per year of the following regulated NSR pollutants: $NO_x$, $SO_2$ and/or PM.

20

81.     At all times relevant to this Complaint, the Big Spring Facility and the Borger Facility were each a "major stationary source," a "major emitting facility," and a "major source," within the meaning of the Act and the applicable PSD and NNSR regulations in the Texas SIP, for $NO_x$, $SO_2$ and/or PM because each of these facilities is a carbon black plant that emits or has the potential to emit in excess of 100 tons per year of the following regulated NSR pollutants: $NO_x$, $SO_2$, and/or PM.

82.     At all times relevant to this Complaint, the Borger Facility was a "major source" and a "stationary source" within the meaning of § 112 of the Act, 42 U.S.C. § 7412, because it emits or has the potential to emit 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.

83.     Due to Defendant's failure to comply with applicable regulations promulgated by the EPA and the States of Louisiana and Texas under the PSD and NNSR programs, Plaintiff alleges the First, Second, and Third Claims for Relief below, based on violations resulting from major modifications made at the Addis, Big Spring and Borger Facilities.

84.     Due to Defendant's failure at the Borger Facility to comply with applicable regulations promulgated by EPA pursuant to the NESHAP program, Plaintiff alleges the Fourth Claim for Relief.

85.     Due to Defendant's failure at the Borger Facility to comply with and with $NO_x$ emission limits set forth in the applicable operating permits, Plaintiff alleges the Fifth Claim for Relief.

**First Claim for Relief:  Addis Facility – Violation of NSR Requirements**

86.     Paragraphs 1 through 85 are re-alleged and incorporated by reference.

87.     Subject to a reasonable opportunity for further investigation and discovery, Defendant commenced construction of one or more "major modifications" as defined in the Act, the Louisiana SIP, and applicable implementing regulations, at the Addis Facility.  Such major modifications involved one or more physical changes or changes in the method of operation, including but not necessarily limited to the replacement of the No. C blower serving Units 1 and 2 in 2001.

88.     Defendant undertook the replacement of the No. C blower in order to increase the air serving the reactors, thereby increasing the Facility's capacity to burn feed oil and increasing its production capacity.

89.     Defendant did not obtain a permit, under either the applicable PSD or NNSR regulations, authorizing the changes described in Paragraph 877.

90.     As a result of the increased production capacity available to the Addis Facility, the physical and/or operational changes described in Paragraph 877 resulted in, or should have been expected to result in, a "significant net emission increase" of $NO_x$, $SO_2$ and/or PM.  As such those changes constituted a "major modification" as defined by LAC 33:III.509.A.4 and 509.B.

91.     Because the Addis Facility physical changes and/or changes in the method of operation described in Paragraph 877 constituted a "major modification" or "major modifications," Defendant was required to, among other things, (1) obtain an NSR permit; (2) undertake a BACT and/or LAER determination in connection with the major modification;

(3) install and operate NSR-compliant pollution controls for $NO_x$, $SO_2$ and/or PM emissions;
(4) continuously meet emissions rates based on those NSR-compliant control technology
determinations; and (5) demonstrate that emissions resulting from the major modification
would not cause or contribute to air pollution in violation of any NAAQS in any air quality
control region.

92.     By failing to obtain a permit prior to commencing construction of the
modifications at the Addis Facility, Defendant violated and continues to violate LAC 33:III.509
and 509.I.1 of the Louisiana SIP.

93.     By failing to undertake a BACT and/or LAER determination and install
and operate NSR-compliant pollution controls to control $NO_x$, $SO_2$, and/or PM emissions, and
by failing to continuously meet the required NSR emissions rates applicable to the modified
Addis Facility, Defendant violated and continues to violate Section 165 of the Act, 42 U.S.C.
§ 7475; LAC 33:III.509.J.3 of the Louisiana SIP; 40 C.F.R. § 52.21.

94.     By failing to demonstrate that the major modifications made to the Addis
Facility did not cause or contribute to air pollution in violation of any NAAQS, the Defendant
violated and continues to violate LAC 33:III.509.K and M of the Louisiana SIP.

95.     Unless restrained by an order of this Court, these violations will
continue.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of
the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendant to injunctive relief
and/or a civil penalty of up to $32,500 for each day of violation occurring on or after March 1,
2008 and up to and including January 12, 2009; $37,500 per day for each violation occurring on
or after January 13, 2009 and up to and including November 2, 2015; and $95,284 per day for

each violation occurring after November 2, 2015, pursuant to the Federal Civil Penalties

Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 (note), as amended by 31 U.S.C. § 3701

(note), 40 C.F.R. § 19.4, and 82 Fed. Reg. 3633 (Jan. 12, 2017).  La. R.S. 30:2025E provides

for similar civil penalties to be awarded to LDEQ.

### Second Claim for Relief:  Big Spring Facility – Violation of PSD Requirements

96. Paragraphs 1 through 85 are re-alleged and incorporated by reference.

97. Subject to a reasonable opportunity for further investigation and

discovery, Defendant commenced construction of one or more "major modifications" as

defined in the Act, the Texas SIP, and applicable implementing regulations, at the Big Spring

Facility.  Such major modifications included one or more physical changes or changes in the

method of operation, including but not necessarily limited to (a) the replacement of three

blowers at Unit 3 in 2000; and (b) the replacement of an air preheater at Unit 1 in May, 2010.

98. Defendant replaced the blowers in order to increase oil loading to the

reactors, allowing the Facility to increase its production of carbon black at Unit 3 by thousands

of pounds per day.  Defendant's replacement of the air preheater increased the oil rate capacity

at Unit 1, again allowing the Facility to increase its production of carbon black.

99. As a result of the increased production capacity available to the Big

Spring Facility, each of the physical and/or operational changes described in Paragraph 977

resulted in, or should have been expected to result in, a "significant net emission increase" of

$NO_x$, $SO_2$ and/or PM.  As such each of those changes constituted a "major modification" as

defined by 40 C.F.R. § 52.21(b) and 30 TAC §§ 116.12, 116.160.

100.    Because each of the Big Spring Facility physical changes and/or changes in the method of operation described in Paragraph 977 constituted a "major modification" or "major modifications," Defendant were required to, among other things, (1) obtain a PSD permit; (2) undertake a BACT determination in connection with the major modification; (3) install and operate BACT for $NO_x$, $SO_2$, and/or PM emissions; (4) continuously meet BACT emissions rates; and (5) demonstrate that emissions resulting from the major modification would not cause or contribute to air pollution in violation of any national ambient air quality standard in any air quality control region.

101.    As to each of the changes described in Paragraph 977, Defendant did not (a) obtain a PSD permit authorizing the changes described in Paragraph 977 prior to making the major modification; (b) apply BACT at the Facility as required; or (c) demonstrate that the proposed change would not cause a significant deterioration of air quality.

102.    By failing to obtain a permit prior to commencing construction of the modifications at the Big Spring Facility, Defendant violated and continues to violate Section 165 of the Act, 42 U.S.C. § 7475; 40 C.F.R. § 52.21; 30 TAC §§ 116.110(a) and 116.160.

103.    By failing to undertake a BACT determination and install and operate BACT to control $NO_x$, $SO_2$ and/or PM emissions, and by failing to continuously meet the required NSR emissions rates applicable to the modified Big Spring Facility, Defendant violated and continues to violate Section 165 of the Act, 42 U.S.C. § 7475; 40 C.F.R. § 52.21; 30 TAC §§ 116.111(a)(2)(C) and 116.160.

104.     By failing to demonstrate that the proposed change did not cause a significant deterioration of air quality, Defendant violated and continues to violate Section 165 of the Act, 42 U.S.C. § 7475; 40 C.F.R. § 52.21; and 30 TAC § 116.160.

105.     Unless restrained by an order of this Court, these violations will continue.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendant to injunctive relief and/or a civil penalty of up to $32,500 for each day of violation occurring on or after March 1, 2008 and up to and including January 12, 2009; $37,500 per day for each violation occurring on or after January 13, 2009 and up to and including November 2, 2015; and $95,284 per day for each violation occurring after November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 (note), as amended by 31 U.S.C. § 3701 (note), 40 C.F.R. § 19.4, and 82 Fed. Reg. 3633 (Jan. 12, 2017).  Further, as provided in Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Defendant is liable for injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

**Third Claim For Relief: Borger Facility – Violation of PSD Requirements**

106.     Paragraphs 1 through 85 are re-alleged and incorporated by reference.

107.     Subject to a reasonable opportunity for further investigation and discovery, Defendant commenced construction of one or more "major modifications" as defined in the Act, the Texas SIP, and applicable implementing regulations, at the Borger Facility.  Such major modifications included one or more physical changes or changes in the

method of operation, including but not necessarily limited to the installation of an additional blower at the Borger Facility in 2001.

108.    Defendant installed an additional blower at the Borger Facility in order to increase air volume in the production process, allowing the Facility to increase its production of carbon black by thousands of pounds per day.

109.    As a result of the increased production capacity available to the Borger Facility, the physical and/or operational changes described in Paragraph 1077 resulted in, or should have been expected to result in, a "significant net emission increase" of $NO_x$, $SO_2$ and/or PM.  As such those changes constituted a "major modification" as defined by 40 C.F.R. § 52.21(b) and 30 TAC §§ 116.12, 116.160.

110.    Because the Borger Facility physical changes and/or changes in the method of operation described in Paragraph 1077 constituted a "major modification" or "major modifications," Defendant was required to, among other things, (1) obtain a PSD permit; (2) undertake a BACT determination in connection with the major modification; (3) install and operate BACT for $NO_x$, $SO_2$, and/or PM emissions; (4) continuously meet BACT emissions rates; and (5) demonstrate that emissions resulting from the major modification would not cause or contribute to air pollution in violation of any national ambient air quality standard in any air quality control region.

111.    As to each of the changes described in Paragraph 1077, Defendant did not (a) undertake a BACT determination and obtain a PSD permit authorizing the changes described in Paragraph 1077 prior to making the major modification; (b) apply BACT at the

27

Facility as required; or (c) demonstrate that the proposed change would not cause a significant deterioration of air quality.

112.    By failing to obtain a permit prior to commencing construction of the modifications at the Borger Facility, Defendant violated and continues to violate Section 165 of the Act, 42 U.S.C. § 7475; 40 C.F.R. § 52.21; 30 TAC §§ 116.110(a) and 116.160.

113.    By failing to install and operate BACT to control $NO_x$, $SO_2$, and/or PM emissions, and by failing to continuously meet BACT emissions rates applicable to the modified Borger Facility, Defendant violated and continues to violate Section 165 of the Act, 42 U.S.C. § 7475; 40 C.F.R. § 52.21; 30 TAC §§ 116.111(a)(2)(C) and 116.160.

114.    By failing to demonstrate that the proposed change did not cause a significant deterioration of air quality, Defendant violated and continues to violate Section 165 of the Act, 42 U.S.C. § 7475; 40 C.F.R. § 52.21; and 30 TAC § 116.160.

115.    Unless restrained by an order of this Court, these violations will continue.  As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of the Act, 42 U.S.C. § 7477, the violations set forth above subject Defendant to injunctive relief and/or a civil penalty of up to $32,500 for each day of violation occurring on or after March 1, 2008 and up to and including January 12, 2009; $37,500 per day for each violation occurring on or after January 13, 2009 and up to and including November 2, 2015; and $95,284 per day for each violation occurring after November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 (note), as amended by 31 U.S.C. § 3701 (note), 40 C.F.R. § 19.4, and 82 Fed. Reg. 3633 (Jan. 12, 2017).  Further, as provided in Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Defendant is liable for injunctive

relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

**Fourth Claim for Relief:  NESHAP/MACT Violation at Borger Facility**

116.    Paragraphs 1 through 85 are re-alleged and incorporated by reference.

117.    Carbon black production is listed as a source category in 40 C.F.R. Part 63, Subpart YY.  40 C.F.R. § 63.1103(f).

118.    The carbon black production units at the Borger Facility are subject to 40 C.F.R. Part 63, Subpart YY.

119.    40 C.F.R. § 63.1103(f) provides that a "carbon black production main unit filter process vent" with a HAP concentration equal to or greater than 260 parts per million by volume is subject to specified control requirements.

120.    Pursuant to 40 C.F.R. § 63.1104(a), carbon black production owners or operators are required to calculate HAP concentrations in the emission streams from main unit filter process vents to determine applicability.

121.    The definition of "process vent" is "the point of discharge to the atmosphere (or the point of entry into a control device, if any) of a gas stream from a unit operation within a source category subject to this subpart."  40 C.F.R. § 63.1101.

122.    The definition of "unit operation" extends to "equipment used in processing, among other things, to prepare reactants, facilitate reactions, separate and purify products, and recycle materials." 40 C.F.R. § 63.1101.

123.    At all times relevant to this Complaint, the Defendant owned and operated primary bag filters at the Borger Facility that separate the primary product, carbon black, from the exhaust gas streams.

124.    The primary bag filters and devices that receive the gas stream before it escapes to the atmosphere directly are "unit operations" within the meaning of Subpart YY. 40 C.F.R. § 63.1101.

125.    The primary bag filters at the Borger Facility are "main unit filters" within the meaning of Subpart YY because they separate carbon black from the tail gas stream. 40 C.F.R. § 63.1103(f)(2).

126.    The exhaust gases from the primary bag filter vents from Units 1, 2, 3, and 4 at the Borger Facility contain a HAP concentration equal to or greater than 260 parts per million by volume.

127.    Any point of discharge to the atmosphere of such exhaust gases constitutes a main unit filter process vent, subject to 40 C.F.R. Part 63, Subpart YY.  40 C.F.R. § 63.1103(f).

128.    Piping downstream of each primary bag filter at the Borger Facility directs the exhaust gas stream to a flare or to a boiler or dryer for fuel use.

129.    On August 16, 2017, EPA inspectors visiting the Borger Facility detected elevated levels of carbon monoxide ("CO") through the use of a multi-gas detector.  During these inspections, EPA inspectors also observed process piping and conveyance equipment that were severely corroded and compromised by holes and cracks.

30

130.    Upon information and belief, the elevated levels of CO detected by the inspectors emanated from the exhaust gas stream that escaped from the process piping and conveyance equipment downstream of the primary bag filters into the atmosphere.

131.    Exhaust gases that escape directly into the atmosphere after exiting the primary bag filters are subject to the monitoring and control requirements of Table 8 of 40 C.F.R. § 63.1103(f).

132.    Since at least August 16, 2017, Defendant violated and continues to violate the provisions governing carbon black production process vents in 40 C.F.R. Part 63, Subpart YY that require main unit filter process vents to be monitored and controlled, including but not limited to the requirements to calculate HAP concentrations and reduce emissions.  40 C.F.R. §§ 63.1104(a); 63.1103(f); 30 TAC §§ 101.20(2) and 113.560.

133.    Subpart YY, and specifically 40 C.F.R. § 63.1108(a)(5), is an applicable requirement for the carbon black production units at the Borger Facility.

134.    The Title V Permit O-1414, issued on September 23, 2003, does not include these provisions as applicable requirements, in violation of 30 TAC 122.142(b)(2)(A).

135.    Unless restrained by an order of this Court, these violations will continue.  As provided in CAA Section 113(b), 42 U.S.C. § 7413(b), and 40 C.F.R. § 19.4, the violations set forth above subject Defendant to injunctive relief and/or a civil penalty of up to $37,500 per day for each violation occurring on or after January 13, 2009 and up to and including November 2, 2015; and $95,284 per day for each violation occurring after November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 (note), as amended by 31 U.S.C. § 3701 (note), 40 C.F.R. § 19.4, and 82 Fed. Reg. 3633

(Jan. 12, 2017).  Further, as provided in Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Defendant is liable for injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of each violation.

### Fifth Claim for Relief:  Borger Facility – NO$_x$ Permit Violations

136.    Paragraphs 1 through 85 are re-alleged and incorporated by reference.

137.    Defendant is authorized to operate the air emission equipment at the Borger Facility by TCEQ NSR/PSD Air Permit Numbers 1867A and PSDTX1032 ("Air Permit").  In addition, Defendant is authorized to operate the Borger Facility pursuant to Title V Permit Number O-1414, first issued by TCEQ on September 23, 2003 (and subsequently revised and renewed).

138.    For each emission point at the Facility, the Air Permit specifies the authorized emissions.

139.    Special Condition 1A and the Maximum Allowable Emission Rates Table ("MAERT") in the Air Permit authorizes emissions of NO$_x$ from the Plant 2 Dryer Stack ("EPN-122") not to exceed the rate of 84.84 lbs/hour.

140.    The Air Permit specifies that emissions that exceed the limits set forth in the MAERT are not authorized and are violations of the Air Permit.

141.    The emission limits set forth in the Air Permit are applicable requirements under 30 TAC Chapter 122 and are federally enforceable under the Borger Title V Permit O-1414.

142.    On January 10, 2017, EPA issued a request to the Defendant, pursuant to Section 114 of the Act, 42 U.S.C. § 7414, to monitor NO$_x$ and SO$_2$ emissions from, *inter alia*,

32

the Plant 2 Dryer Stack ("EPN-122"), using a continuous emission monitoring system

("CEMS").

143.     According to the CEMS data for EPN-122, $NO_x$ emissions from the Plant

2 Dryer Stack exceeded the maximum $NO_x$ emission rate of 84.84 lbs/hour on at least the

following 37 days:  April 6, 2017; May 26, 2017; May 27, 2017; May 28, 2017; May 29, 2017;

May 31, 2017; June 7, 2017; June 8, 2017; June 9, 2017; June 10, 2017, June 11, 2017; June 18,

2017; June 22; 2017; June 23, 2017; June 24, 2017; June 25, 2017; June 26, 2017; June 28,

2017; June 29, 2017; June 30, 2017; July 1, 2017; July 2, 2017; July 3, 2017; July 4, 2017; July

5, 2017; July 6, 2017; July 12, 2017; July 13, 2017; July 15, 2017, July 20, 2017; July 21, 2017;

July 22, 2017; July 23, 2017; July 24, 2017; July 25, 2017; July 26, 2017; and July 27, 2017.

144.     The violations of the $NO_x$ emission rate in the Air Permit described in

Paragraph 1433 constitute violations of the Air Permit, of Title V Permit Number O-1414, and

of 30 TAC §§ 116.115(b)(2)(F) and 116.115(c).

145.     Unless restrained by an order of this Court, these violations will

continue.  As provided in CAA Section 113(b), 42 U.S.C. § 7413(b), and 40 C.F.R. § 19.4, the

violations set forth above subject Defendant to injunctive relief and/or a civil penalty of up to

$95,284 per day for each violation occurring after November 2, 2015, pursuant to the Federal

Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 (note), as amended by 31

U.S.C. § 3701 (note), 40 C.F.R. § 19.4, and 82 Fed. Reg. 3633 (Jan. 12, 2017).  Further, as

provided in Sections 7.032, 7.101, and 7.102 of the Texas Water Code, Defendant is liable for

injunctive relief and civil penalties of not less than $50 nor greater than $25,000 for each day of

each violation.

**Sixth Claim for Relief:  Claim for Attorney's Fees to Texas**

146.     Plaintiffs reallege and incorporate by reference the foregoing Paragraphs.

147.     Texas has expended and will expend through the course of litigation reasonable attorney's fees, court costs, and/or reasonable investigative costs.

148.     Pursuant to Section 7.108 of the Texas Water Code, Defendant is liable for Texas's reasonable attorney's fees, court costs, and reasonable investigative costs.


**PRAYER FOR RELIEF**

WHEREFORE, based upon all the allegations contained in Paragraphs 1 through 148 above, the Plaintiffs request that this Court:

1.     Permanently enjoin the Defendant from operating the Borger Facility, the Addis Facility, and the Big Spring Facility, except in accordance with the Clean Air Act, the Texas Clean Air Act, and all applicable regulatory requirements;

2.     Order the Defendant to remedy their violations of applicable state and federal regulations by, among other things, requiring Defendant to install and operate the best available control technology or the lowest achievable emission rate at their Facilities, as required, for each pollutant subject to regulation under the Clean Air Act;

3.     Order Defendant to apply for and comply with all permits for their Facilities that are in conformity with the requirements of the PSD and NNSR provisions of the Act and the Louisiana and Texas SIPs;

4.      Order Defendant to conduct audits of their operations to determine if any additional modifications have occurred which would require them to meet the requirements of PSD and/or NNSR and report the results of these audits to the United States;

5.      Order Defendant to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act alleged above;

6.      Assess a civil penalty against the Defendant of up to $32,500 for each day of violation occurring on or after March 1, 2008 and up to and including January 12, 2009; $37,500 per day for each violation occurring on or after January 13, 2009 and up to and including November 2, 2015; and $95,284 per day for each violation occurring after November 2, 2015;

7.      Assess a civil penalty against the Defendant of not more than $32,500 for each day of violation, and if it is established that any violation was done intentionally, willfully, or knowingly, or resulted in a discharged or disposal which caused irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health, an additional penalty of not more than $1,000,000, pursuant to La. R.S. 30:2025(E)(1)(a);

8.      Award the State of Texas civil penalties of not less than $50 nor greater than $25,000 per day for each violation;

9.      Award the State of Texas its reasonable attorney's fees, court costs, and reasonable investigative costs for this suit;

10.     Award the United States of America and the LDEQ their costs in this action; and,

11.     Grant such other relief as the Court deems just and proper.

DATED: _____DECEMBER 21_____, 2017

Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

ELIAS L. QUINN, CO Bar No. 42159
EMILY C. POWERS
Trial Attorneys
NICOLE VEILLEUX
Senior Counsel
Environmental Enforcement Section
Environmental and Natural Resources Division
Telephone: (202) 514-2756
Elias.Quinn@usdoj.gov
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044

OF COUNSEL:

KELLIE ORTEGA
Attorney
Air Enforcement Division
Office of Civil Enforcement
U.S. EPA
Washington, DC 20460

CARLOS EVANS
Assistant Regional Counsel
Office of Regional Counsel (RC-EA)
U.S. EPA, Region 6
1445 Ross Avenue
Dallas, Texas 75202-2733

COREY R. AMUNDSON
Acting United States Attorney
Middle District of Louisiana

BY: _____

SUSAN C. AMUNDSON, LBN 22710
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, LA 70801
Phone: (225) 389-0443
Fax: (225)389-0685
Email: susan.amundson@usdoj.gov

FOR THE LOUISANA DEPARTMENT OF ENVIRONMENTAL QUALITY:

Herman Robinson, General Counsel (LA Bar# 2077)

By: _____

PERRY THERIOT, LA BAR Roll# 19181
Attorney Supervisor
Brandon B. Williams LA BAR Roll# 27139
Lead Counsel
Office of the Secretary, Legal Division
Louisiana Dept. of Environmental Quality
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Telephone No. (225) 219-3987

FOR THE STATE OF TEXAS:

KEN PAXTON
Attorney General of Texas

JEFFREY MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

PRISCILLA HUBENAK
Chief, Environmental Protection Division

PHILLIP LEDBETTER
Assistant Attorney General
State Bar No. 24041316
Phillip.Ledbetter@oag.texas.gov
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel: (512) 475-4152
Fax: (512) 320-0911

ATTORNEYS FOR THE STATE OF TEXAS