# EXHIBIT 1

9/25/2019 1:39 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 37107295
By: Hilda Yarn
Filed: 9/25/2019 1:39 PM

## 2019-69832 / Court: 151

NO. _____

| | | |
|---|---|---|
| **ORION ENGINEERED CARBONS, LLC, and ORION ENGINEERED CARBONS GmbH,** | § <br> § <br> § <br> § | **IN THE DISTRICT COURT OF** |
| **Plaintiffs,** | § <br> § | |
| **v.** | § <br> § | **HARRIS COUNTY, TEXAS** |
| **HALDOR TOPSOE A/S, HALDOR TOPSOE, INC., and TOKAI CARBON CB LTD.** | § <br> § <br> § <br> § <br> § | |
| **Defendants.** | § | **_____ JUDICIAL DISTRICT** |

### VERIFIED ORIGINAL PETITION AND
### APPLICATION FOR TEMPORARY INJUNCTION

Plaintiffs Orion Engineered Carbons, LLC ("Orion LLC") and Orion Engineered Carbons GmbH (individually "Orion GmbH" and collectively with Orion LLC "Orion") file this Original Petition and application for temporary injunction complaining of Defendants Haldor Topsoe A/S (individually "HTAS"), Haldor Topsoe, Inc. (individually "HTI" and collectively with HTAS "HT"), and Tokai Carbon CB Ltd. ("Tokai") and in support would show as follows:

### I.    DISCOVERY CONTROL PLAN

1.    Orion seeks discovery under Level 3 of Texas Rule of Civil Procedure 190.

### II.    PARTIES

2.    Orion LLC is a company organized and existing under the laws of Delaware, having an office at 4501 Magnolia Cove Drive, Suite 106, Kingwood, Texas 77345. Orion Engineered Carbons, LLC is an indirect subsidiary of Orion GmbH.

3.    Orion GmbH is a company organized and existing under the laws of Germany, having an office at Hahnstrasse 49 Frankfurt am Main, 60528 Germany.

Certified Document Number: 87297813 - Page 1 of 27

4.    HTAS is a company organized and existing under the laws of Denmark. HTAS is the parent company of HTI. HTAS maintains its principal office at Haldor Topsoes Alle 1, DK-2800 Lyngby, Denmark. HTAS does not maintain a registered agent for service of process in Texas; therefore, HTAS can be served with process by serving the Texas Secretary of State as its agent for service of process. Tex. Civ. Prac. & Rem. Code § 17.044.

5.    HTI is a company organized and existing under the laws of Texas with its principal office at 17629 El Camino Real, Suite 300, Houston, Texas 77058. HTI can be served with process by serving its agent for service of process at CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

6.    Tokai is a company organized and existing under the laws of Japan. Tokai maintains its U.S. headquarters at 301 Commerce Street, Suite 500, Fort Worth, Texas 76102. Tokai can be served with process by serving its agent for service of process at Capitol Corporate Services, Inc., 206 E 9th Street, Suite 1300, Austin, Texas 78701.

### III.    JURISDICTION AND VENUE

7.    The Court has jurisdiction over this matter because the amount in controversy is within the jurisdictional limits of this Court. This Court has personal jurisdiction over HTAS because HTAS is doing business in Texas and because the claims arise out of HTAS's contacts with Texas. This Court has personal jurisdiction over HTI because HTI is a citizen of Texas, doing business in Texas, and because the claims arise out of HTI's contacts with Texas. The Court has personal jurisdiction over Tokai because Tokai is doing business in Texas and because the claims arise out of Tokai's contacts with Texas.

8.    Venue is proper in Harris County, Texas because HTI's principal place of business in Texas is in Harris County. Tex. Civ. Prac. & Rem. Code § 15.002. Where venue is proper against one defendant, the court also has venue of all the defendants in all claims or

2

actions arising out of the same transaction, occurrence, or series of transactions or occurrences. *Id*. at § 15.005.

## IV.    FACTUAL BACKGROUND

### A.    Nature of Dispute

9.    Orion is in the business of producing and supplying carbon black, a predominantly petroleum-based product that is used to tint, colorize and enhance the performance of polymers, plastics, paints and coatings, inks and toners, textile fibers, adhesives and sealants, tires, and mechanical rubber goods such as automotive belts and hoses. When the U.S. Environmental Protection Agency determined to require U.S. producers of carbon black to install pollution control technology in their U.S. plants, Orion developed a method of pollution control that significantly reduced the cost for producers of carbon black.    Because of the high cost of such pollution mitigation, and the need for the entire U.S. industry to implement mitigation technology (at a cost of over $100 million per plant), Orion's process is highly valuable.

10.    After developing the process and thoroughly testing it to ensure that it was effective, Orion chose to partner with HT in the implementation of the process for carbon black producers.    Orion entrusted HT with its confidential information only after HT agreed to a written non-disclosure agreement, along with a later License Agreement, attached hereto as Exhibit A and incorporated by reference, which provides that HT will not install such technology in the plants of Orion's competitors until the expiration of a Period of Exclusivity that ends on December 31, 2020.

11.    After HT agreed to these provisions (and confirming the exclusivity agreement in multiple agreements over a period of more than four years), Orion recently learned that HT has

Certified Document Number: 87297813 - Page 3 of 27

3

not only disclosed Orion's confidential information to its biggest competitor, Tokai, but has entered into an agreement to license the technology to Tokai for its plant in Borger Texas (which is across the street from Orion's own plant in Borger).

12.    Orion brings this action to prevent HT from continuing to expose Orion's confidential information to its competitors and from selling to Orion's competitors this valuable technology in violation of HT's written agreement not to do so.  Absent the temporary injunctive relief sought in this petition, Orion is likely to lose the significant value that Orion has created in its confidential technology.

**B.    Carbon Black Production**

13.    Carbon black is a material produced by the incomplete combustion of heavy petroleum products such as FCC tar, coal tar, or ethylene cracking tar. Carbon black is in particular used as a reinforcing filler in tires and other rubber products. Carbon black is also used in plastics, paints, and inks, as a color pigment.

14.    Orion is a worldwide leading supplier of carbon black that produces a broad range of carbon black products including high-performance Specialty Gas Blacks, Furnace Blacks, Lamp Blacks, Acetylene Blacks and Thermal Blacks that tint, colorize and enhance the performance of polymers, plastics, paints and coatings, inks and toners, batteries, textile fibers, adhesives and sealants, tires, and mechanical rubber goods such as automotive belts and hoses.

15.    Orion operates 14 production sites and three Applied Technology and Research and Development Centers globally, focusing on quality supply and collaborative partnerships with customers.

16.    There are only four carbon black producers in the United States who are competitors of Orion.

Certified Document Number: 87297813 - Page 4 of 27

17.    One of Orion's biggest competitors is Tokai, which acquired a large U.S. competitor, Sid Richardson Carbon, in 2018 (hereinafter "Tokai"). Tokai and Orion both operate carbon black plants in Borger Texas, directly across the street from one another.

C.    **EPA Consent Decrees**

18.    Production of carbon black creates environmental pollutants such as nitrogen oxide (NOx), sulfur dioxide (SO2), and particulate matter.

19.    In 2009, the United States Environmental Protection Agency ("EPA") and Department of Justice ("DOJ") began an investigation of all of the major carbon black producers in the United States, including Orion and Tokai, for alleged violations of the Clean Air Act related to emissions of SO2 and NOx from the production of carbon black products.

20.    All U.S. carbon black producers ultimately settled with the EPA. Respectively, in December 2017 as the last two industry players, Orion and Tokai entered into EPA consent decrees ("Consent Decrees") settling the alleged Clean Air Act violations on similar terms as one another and as the other U.S. carbon black producers.

21.    The Orion and Tokai Consent Decrees required them, among other things, to install and operate pollution control technology in order to meet certain SO2 and NOx emission limits by certain defined dates.  Under the Orion and Tokai Consent Decrees, the "first round" of implementation requires installation of such pollution control technology at Orion's Ivanhoe Louisiana plant and Tokai's Borger Texas plant to be completed by April 2021, followed by further rounds of installations at other plants.

D.    **Development of Control Technology with HT**

22.    In order to comply with their obligations under the Consent Decrees, Orion and its competitors, including Tokai, would each be required to make substantial investments of up to

approximately $100,000,000 per plant, in emissions control technology and a many years long process of retrofitting their plants with this technology.

23.    Traditional emissions control technology used in carbon black production uses wet gas scrubbers to manage SO2 emissions. Wet gas scrubbers or wet scrubbers combine polluted gas streams with a scrubbing liquid to remove pollutants.

24.    Wet sulfuric acid process ("WSA") is an alternative technology for treating SO2, but one that had never been used in the carbon black industry because it was widely believed that utilizing WSA in the production of carbon black would require an unreasonably high capital investment that would make the use of WSA technology uneconomical.

25.    In 2013, Orion recognized that the ability to use WSA technology in the treatment of carbon black emissions could be very valuable and began development of a breakthrough technology that it hoped would reduce the cost of the use of WSA technology in the treatment of carbon black emissions. Orion's motivation in pursuing this new technology was that, based on the EPA's initiative against all carbon black producers, it appeared that the entire industry would be required to install emissions control technology, and if Orion could develop an economical way to use WSA methods, it would be far superior to traditional wet scrubbing techniques. Specifically, while wet scrubbing results in the creation of a stream of waste water that must itself be discarded at significant cost, WSA technology causes the creation only of sulphuric acid, which is a commodity that can be sold into the market for commercial use, thereby significantly decreasing the operating cost of the emissions control process.

26.    This breakthrough had significant potential value to Orion, particularly because of the ongoing EPA investigation, as a result of which all of the major carbon black producers would need to install new emissions control technology in their plants in the United States.

Certified Document Number: 87297813 - Page 6 of 27

27.    Orion estimated the potential competitive advantage of using WSA over traditional wet scrubbing to be approximately $90 per ton of carbon black produced, amounting to a benefit of nearly $12 million annually, based on operational cost savings for one plant alone. This operational cost savings would allow Orion to offer products at more competitive pricing, thereby allowing it to gain a larger portion of the market share. This cost saving estimate did not take into account other competitive advantages of using WSA—such as increased market share as a result of more competitive pricing, the significant reduction in the overall environmental impact without any landfill waste, or the ability to commercialize the product to competitors for use in other carbon black plants, all of which are more difficult, if not impossible, to quantify.

28.    In order to implement this new technology, however, Orion sought a partner that had an existing WSA business and experience in large scale industrial implementation.  Orion chose HT, which is one of the leading companies in catalysis and also offered WSA technology. HT developed a WSA technology and specializes in the production of heterogeneous catalysts and the design of process plants based on catalytic processes. HT brands its WSA technology "SNOX."

29.    As of 2013, HT supplied SNOX catalysts, proprietary technologies, process design, engineering, and services for use in the fertilizer industry, chemical and petrochemical industries, and the energy sector, including refineries and power plants.

30.    Despite significant experience and success with its SNOX technology in a variety of production industries, for the reasons discussed above, HT had not previously applied its SNOX technology to carbon black production.

31.    Starting in early 2014, Orion began to reach out to HT (as well as HT's competitors) to inquire about adapting WSA technology for treating sulfur oxides and nitrogen

Certified Document Number: 87297813 - Page 7 of 27

oxides in connection with the production of carbon black to enable Orion to comply with its anticipated obligations under the Consent Decree with the EPA.

32.    In order to collaborate with HT to adapt its SNOX technology for use in carbon black production, HT and Orion originally believed they would be required to share intellectual property and proprietary information regarding each company's respective processes. Prior to sharing any intellectual property or proprietary information, Orion and HT planned to enter into a mutual, reciprocal non-disclosure agreement that would prohibit the distribution of protected information.

33.    In September 2014, the parties began negotiations on the terms of the Mutual Confidentiality Agreement between Orion and HTAS (together with amendments referred to herein as the "NDA"). Given that both parties regarded their respective confidential information as extremely valuable, the negotiations continued for a year and were ultimately concluded by signing the NDA at the end of August 2015.

34.    Given Orion's desire to proceed with developing the emission control technology required by the Consent Decree, Orion began developing and constructing its own modified WSA solution for use in the carbon black production in Malmö Sweden without access to or use of HT's proprietary technology or other catalysts, using only publicly available information and catalysts available on the market.

35.    Orion conducted the initial Malmö pilot testing from August 6 – 21, 2015 without any involvement or support from HT as the NDA was not signed.    Those tests successfully validated the effective and economical use of WSA technology for carbon black emissions in Orion's Malmö test plant.    Orion's breakthrough was the elimination of expensive capital equipment in the WSA process (specifically, eliminating an electrostatic precipitator that

Certified Document Number: 87297813 - Page 8 of 27

required cooling and then reheating of the effluent stream), and replacing it with a much less expensive guard bed with an oxidizing catalytic process. Using catalysts available on the market, Orion validated the use of the new technology, and demonstrated that it could be highly economical for use in the treatment of carbon black emissions. The successful testing of the technology in Malmö was the product of years of work by Orion and its research and development team, and expenditure of more than 900,000 € .

36.    On August 14, 2015, Orion GmbH filed a provisional patent application with the U.S. Office of Patents and Trademarks, covering its technology obtaining priority patent rights as of that date.

37.    On April 13, 2016, HTAS filed an international patent application covering similar technology.

38.    On August 10, 2016, Orion GmbH filed an international patent application for its technology, with a priority date of August 14, 2015 based on its U.S. patent application.

39.    On July 26, 2019, HTAS filed a patent entitlement proceeding in Germany against Orion GmbH seeking transfer of Orion GmbH's worldwide patent rights to HTAS.   Orion GmbH disputes the claims in the German patent proceeding and intends to litigate them vigorously.   The outcome of such proceeding, however, has no bearing on the present dispute, which is based on Orion's exclusive contractual rights to its confidential and proprietary information and the exclusive use of the SNOX technology in the carbon black industry in the United States.

**E.    The NDA**

40.    On August 28, 2015, following Orion's independent, successful trial in Malmö, Orion GmbH and HTAS entered into the NDA. A redacted copy of the NDA is attached as

9

Appendix III to the License Agreement, attached hereto as Exhibit A. The NDA provided that in the interest of incorporating SNOX technology into Orion's plants, the parties would disclose to one another proprietary technical information, including information concerning Orion's carbon black business and processes that Orion has developed over the course of many years and invested substantial time and money in developing. NDA Preamble. This included Orion's newly gained know how and innovations regarding emissions processes developed in connection with the Malmö test plant.

41.    The NDA defines "[Orion] Confidential Information" to mean "data, know-how, trade secrets, formulae, processes, specifications and similar information related to [Orion]'s carbon black technology, the [Orion] processes and all commercial information which [Orion] provides to HTAS pursuant to [the] Agreement and related to the Project." Project was defined as relating to Orion's plant in Borger Texas and extending to other plants the parties agreed to in writing, each of which would also be considered a Project under the NDA. NDA Preamble. The NDA further provides that the "confidentiality obligations under this Agreement do not depend on the actual marking of the provided information as 'Confidential' but are existent also with regard to CONFIDENTIAL INFORMATION not marked as 'Confidential.'" NDA ¶ 4.

42.    The NDA provides that Confidential Information must be held in confidence and not disclosed to any third party unless certain limited exceptions are met, such as the Confidential Information becoming part of the public domain, disclosure being required by a governmental body or legal process, or where the receiving party can show that the information was received free of obligations of confidentiality. NDA ¶ 6.

43.    The NDA further provides that the receiving party must obtain prior written approval to disclose Confidential Information to a third party. NDA ¶ 8.

Certified Document Number: 87297813 - Page 10 of 27

44.    Finally, the NDA provides that HT agrees not to make any commercial use of and not to incorporate in any plant (other than a plant for Orion) any of Orion's Confidential Information unless an enumerated exception applies or it is specifically agreed to by Orion in writing. NDA ¶ 12.

45.    The NDA expressly authorized HTAS and Orion GmbH to share confidential information with affiliates, including Orion LLC and HTI, subject to the same confidentiality obligations imposed on HTAS and Orion GmbH under the NDA.    NDA ¶ 16.

46.    The NDA provides that it is to be governed by and construed in accordance with the laws of Denmark. NDA ¶ 18.

**F.    The Letter of Agreement**

47.    Based on its innovations, Orion decided to apply and upscale the procedures it had invented at the Malmö pilot plant to its actual production facilities in the U.S. In order to do so, Orion needed a vendor that was capable of building large scale equipment required to function in actual plant operations.

48.    On September 23, 2015, Orion GmbH entered into a Letter of Agreement with HTAS and HTI that provided for the potential installation of SNOX technology at one or more of Orion's carbon black plants in the United States.  A redacted copy of the September 23, 2015 Letter Agreement is attached as Appendix IV to the License Agreement, Exhibit A. Pursuant to the Letter of Agreement, HT was authorized to conduct testing of its SNOX technology at Orion's Malmö pilot plant which, if successful, would allow the parties to negotiate the terms of the final project.

49.    Given that Orion had pioneered the use of WSA technology for carbon black plants, one of Orion's critical objectives in entering into the Letter of Agreement was to ensure

Certified Document Number: 87297813 - Page 11 of 27

that it would have a period of exclusivity in the United States' carbon black market for the use of the SNOX technology.   To that end, in the Letter of Agreement, the parties agreed that if Orion signed definitive agreements for installation of SNOX technology at an Orion plant by July 1, 2016, HT would agree not to license SNOX technology for use in any carbon black plant in the U.S. until December 31, 2020 (the "Period of Exclusivity"). September 23, 2015 Letter Agreement ¶ 4. It was further agreed that the Period of Exclusivity would be extended by two years for each additional Orion plant that adopted SNOX technology from HT. September 23, 2015 Letter Agreement ¶ 4.

50.    The Letter of Agreement provides that it is to be governed by and construed in accordance with the laws of England. September 23, 2015 Letter Agreement ¶ 11.

51.    Following the execution of the Letter of Agreement and continuing through April 2018, significant additional negotiations on project terms, scope, and price took place between the parties.  During that time, the Letter of Agreement was amended seven times, particularly to address the time that had elapsed while the parties concluded their lengthy project negotiations. The seventh, and final, amendment, which was entered into on April 6, 2018, confirmed that if Orion signed definitive agreements for the installation of SNOX technology at its Ivanhoe plant by April 9, 2018, the Period of Exclusivity would continue through December 31, 2020, and that agreements for installation of the technology at subsequent Orion plants would further extend the Period of Exclusivity. April 6, 2018 Letter Agreement ¶ 4. The April 6, 2018 Letter Agreement is attached as Appendix IV to the License Agreement, Exhibit A.

G.    **The License Agreement**

52.    On April 9, 2018, Orion LLC and HTI entered into definitive agreements to install SNOX technology at Orion's Ivanhoe plant:  a Catalyst Supply Agreement, an Equipment

Supply Agreement, an Engineering Agreement, and a License Agreement whereby HTI agreed to license its SNOX technology to Orion LLC to be integrated into the Ivanhoe plant (the "License Agreement"). A redacted copy of the License Agreement is attached as Exhibit A.

53.    The License Agreement granted Orion a license for the use of any and all intellectual property and other proprietary rights controlled by HT and any of its affiliates for the design and building of a SNOX emissions control unit by HT in Orion's Ivanhoe plant and to use HT technical information, catalysts, and equipment and to sell products developed or produced using the HT's Processes. License Agreement § 2.1.

54.    The License Agreement expressly incorporated the terms of the Period of Exclusivity as defined in the Letter of Agreement.   Specifically, the License Agreement provided:

> For certainty, the LETTER AGREEMENT and the Period of Exclusivity as defined in clause 4 of the LETTER AGREEMENT shall continue to apply. The PARTIES acknowledge and agree that the exclusivity provisions in clause 4 of the LETTER AGREEMENT are a material basis of this Agreement and are hereby incorporated into and apply to this AGREEMENT, and nothing in this AGREEMENT will limit or modify such rights or obligations of the PARTIES.

License Agreement § 6.1.

55.    The Catalyst Supply Agreement, Equipment Supply Agreement, Engineering Agreement, and License Agreement were fully executed and became effective on April 9, 2018, which, pursuant to the April 6, 2018 Amendment to the Letter Agreement, provided for a Period of Exclusivity to December 31, 2020.

56.    The Period of Exclusivity was a key component of the License Agreement—agreed to three years earlier by the Parties as the basis for all further negotiations and collaborations—to protect Orion's substantial investment in adapting WSA technology for carbon black production; to protect its patent, other intellectual property, and proprietary

Certified Document Number: 87297813 - Page 13 of 27

13

information; and to maintain its competitive advantage among a narrow group of competitors in the U.S., all of whom were also required to implement emission control technology to comply with consent decrees with the EPA.

57.    The License Agreement also expressly incorporated the terms of the NDA. The NDA is binding on HTI through the terms of the License Agreement and by the express terms of the NDA, which extends the confidentiality obligations to HTAS affiliates.  License Agreement § 5.1.

58.    The License Agreement provides that it shall be construed by the substantive law of the State of New York. License Agreement § 12.1. The License Agreement also contains an arbitration clause, which provides that any controversy or claim arising out of or relating to the License Agreement shall be settled by arbitration administered by the American Arbitration Association and the place of arbitration shall be New York, New York. License Agreement § 12.2.

59.    Notwithstanding the arbitration clause, the License Agreement provides:  "The foregoing provisions shall not affect the right of any PARTY to apply to any court of competent jurisdiction for temporary injunctive relief to safeguard the confidentiality or non-use provisions of this AGREEMENT." License Agreement § 12.2.

60.    The License Agreement further provides:

Each of the PARTIES acknowledges and agrees that [ORION] may be irreparably harmed if any of the provisions of the PARTIES' AGREEMENTS are not performed in accordance with their specific terms or are otherwise breached, and that non-performance or breach of the PARTIES' AGREEMENTS could not be adequately compensated by monetary damages alone and that [ORION] would not have adequate remedy through the liquidated damages provisions set forth herein or otherwise at LAW. Accordingly, in addition to the other rights and remedies set forth under the PARTIES' AGREEMENTS to which [ORION] may be entitled, [ORION] shall be entitled to seek to enforce any provision of the PARTIES' AGREEMENTS by a decree of specific performance and to

Certified Document Number: 87297813 - Page 14 of 27

temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of the PARTIES' AGREEMENTS without posting any bond or other undertaking. [HT] agree[s] that [it] will not contest the appropriateness of specific performance as a remedy.

License Agreement § 9.1.

### H.    Tokai Seeks License from Orion

61.    In 2018, Orion's longstanding Chief Executive Officer ("CEO") retired, and was replaced by Corning Painter as new CEO of Orion group.  As part of the transition, Orion met with a number of key industry players to introduce Mr. Painter.

62.    On January 29, 2019, Orion executives met with executives of Tokai in Tokyo, Japan.  Participants from Orion included:  Corning Painter, Jack Clem, Director of the Board and former CEO, and Sungdo Gong, Senior Vice President of Strategic Development. Participants from Tokai included:  Hajime Nagasaka, President and CEO, Nick Murofushi, Senior Managing Executive Officer, Corporate Planning, and Maiko Kamiguchi, Secretary to the CEO.

63.    On January 29, 2019, Tokai's Hajime Nagasaka referenced the SNOX testing done in Sweden and that Tokai had heard the results were favorable and expressed the intent to use SNOX technology as well. There was no further discussion of SNOX technology with Tokai during the January 29 meeting.

64.    In February 2019, Tokai's President, Bill Jones, contacted Orion's Corning Painter acknowledging that Orion had a licensing agreement with HT for use of the SNOX technology and requesting a meeting to discuss Orion extending the license to Tokai for use of the same technology.

65.    On or about March 6, 2019, Orion's Corning Painter met with Bill Jones, Tokai America's President and Robert Fogleman, Tokai Human Resources Director. During that meeting, Tokai expressed an interest in acquiring SNOX for use in its U.S. carbon black

facilities. Tokai again acknowledged that it was aware that Orion had an exclusivity agreement with HT covering the technology through December 2020 as well as a patent and expressed an interest in obtaining Orion's consent to Tokai's use of the technology. Orion's Corning Painter explained to Tokai that Orion had worked hard and invested substantial resources in developing the technology to achieve a competitive advantage and would not be willing to forgo those benefits without an exchange of something of similar strategic value. The Parties discussed a possible joint venture involving their N990 production, a unique carbon black product, for which Orion and Tokai are the only significant producers globally.

66.    Following that March 6, 2019 meeting, Orion and Tokai entered into discussions around the joint venture of N990 production. In April 2019, Orion's Corning Painter met with Tokai's William Jones and Ken Tate, President Cancarb Ltd. (a Canadian subsidiary of Tokai) to discuss the contemplated N990 joint venture. During that April meeting, Tokai again acknowledged that Orion had an exclusivity agreement with HT for SNOX technology and expressed an interest in reaching an agreement whereby Orion would consent to Tokais's use of SNOX.

67.    Following the April meeting, discussions around Orion and Tokai reaching agreement on the licensing of SNOX to Tokai, despite Orion's exclusivity, stalled. The parties never reached an agreement whereby Orion would permit the licensing of SNOX technology to Tokai, and Orion never approved HT extending a license to Tokai or any other U.S. carbon black manufacturer.

I.    **HT Provides Its Technology to Tokai Without Orion's Approval in Breach of Exclusivity Agreement**

68.    Despite having never agreed to or approved extending a license to Tokai to use SNOX technology in any U.S. plant, Orion recently learned that Tokai is planning to use HT's

SNOX technology in its Borger Texas plant.  On August 13, 2019, in response to a Freedom of Information Act ("FOIA") request by Orion to the EPA, Orion learned that Tokai had requested the approval of the EPA to change Tokai's proposed pollution control technology from conventional wet scrubbing to WSA technology, including design specifications that only HT uses for the proposed WSA process.  A copy of Tokai's May 13, 2019 letter to the EPA seeking approval to use WSA technology in its Borger plant is attached hereto as Exhibit B and incorporated by reference. The only possible supplier for such technology as described is HT. WSA is the material component in HT's SNOX technology, which Orion adapted for use in carbon black production using its confidential information that HT agreed "not to make any commercial use of and not to incorporate in any plant (other than a plant for Orion)," and subject to the License Agreement's Period of Exclusivity extending through December 31, 2020.

69.     On August 19, 2019, HT and Orion held a meeting to discuss a potential solution to HT's and Orion's conflicting patents. Although Orion offered to enter into a confidentiality agreement covering the August 19 meeting, HT declined to do so.  At that meeting, Orion raised concerns regarding HT's possible violation of the Period of Exclusivity.   During that meeting, HT confirmed that it had executed agreements with Tokai to deliver components of its emissions control solutions to Tokai for use in its Borger Texas plant. Combined with the information received in response to Orion's FOIA request to the EPA, Orion concluded that HT entered into an agreement with Tokai to incorporate WSA—the fundamental component of the SNOX technology— into Tokai's Borger Plant.

70.     HT's provision of WSA technology for use in Tokai's Borger plant is in direct violation of the terms of the NDA and License Agreement including the Letter of Agreement. Moreover, Tokai knew of Orion's rights in the technology and circumvented Orion's approval to

17

Certified Document Number: 87297813 - Page 17 of 27

use the technology by going directly to HT to obtain the technology without Orion's consent. Such conduct exposes Orion to irreparable harm by handing Orion's competitive advantage, which was six years and nearly one million dollars in the making, to one of Orion's largest competitors to use in a facility directly across the street from Orion's own Borger plant.

## V. CAUSES OF ACTION

71.    HT's conduct, described above, gives rise to causes of action for breach of the NDA and breach of the License Agreement including the Letter of Agreement.  Tokai's conduct also gives rise to tortious interference with contract. Pursuant to the License Agreement, Orion's claims as to HT are subject to arbitration.  However, as a result of HT's ongoing violations of Orion's rights under the NDA and License Agreement, Orion faces the risk of probable, immediate, and irreparable harm that will cause severe prejudice to Orion and may render the final arbitration award in this matter ineffectual.  Accordingly, Orion seeks temporary injunctive relief against HT pending the final arbitration hearing and award in relation to the claims set forth herein in order to preserve the status quo until a final award is issued.  Orion also seeks temporary injunctive relief and damages against Tokai.

## VI. COUNT ONE:  BREACH OF THE NDA
## (as to HTAS and HTI)

72.    Plaintiffs re-allege and incorporate by reference all the allegations in the preceding paragraphs as if fully set forth here.

73.    Orion GmbH and HTAS are parties to a valid and enforceable NDA agreement, which is binding on Orion LLC and HTI.

74.    Orion fully complied with its obligations under the NDA.

75.    HT breached the NDA by disclosing Orion's Confidential Information to Tokai without Orion's prior approval.

Certified Document Number: 87297813 - Page 18 of 27

76.     HT's breach of the NDA caused Orion injury, including irreparable harm.

## VII.    COUNT TWO:  BREACH OF THE LICENSE AGREEMENT
### (as to HTAS and HTI)

77.     Plaintiffs re-allege and incorporate by reference all the allegations in the preceding paragraphs as if fully set forth here.

78.     Orion LLC and HTI are parties to a valid and enforceable License Agreement, which incorporates the terms of the NDA and Letter Agreement binding HTAS.

79.     Orion fully complied with its obligations under the License Agreement.

80.     HT breached the License Agreement by licensing another installation of SNOX technology for use in Tokai's carbon black plant in the U.S. during the Period of Exclusivity.

81.     HT's breach of the License Agreement caused Orion injury, including irreparable harm.

## VIII.   COUNT THREE:  TORTIOUS INTERFERENCE WITH CONTRACT
### (as to Tokai)

82.     Plaintiffs re-allege and incorporate by reference all the allegations in the preceding paragraphs as if fully set forth here.

83.     Orion had a valid NDA and License Agreement with HT.

84.     Tokai willfully and intentionally interfered with Orion's NDA and License Agreement with HT.

85.     Tokai's tortious interference proximately caused Orion injury, including irreparable harm.

86.     Orion has incurred actual damages as a result of Tokai's tortious interference.

## IX.    CONDITIONS PRECEDENT

Certified Document Number: 87297813 - Page 19 of 27

87.    All conditions precedent have been performed, have occurred, have been satisfied, or have been waived.

## X.    REQUEST FOR DISCLOSURE

88.    Pursuant to Tex. R. Civ. P. 194, Orion requests that Defendants provide the disclosure information required under Rule 194.2 of the Texas Rules of Civil Procedure.

## XI.    REQUEST FOR TEMPORARY INJUNCTION

89.    Orion asks the Court to set its application for temporary injunction for a hearing and, after the hearing, to issue a temporary injunction against Defendants.

90.    Plaintiffs re-allege and incorporate by reference all the allegations in the preceding paragraphs as if fully set forth here.

91.    Orion's application for temporary injunction is authorized by the express terms of the License Agreement and by applicable law.

### A.    Legal Standard

92.    A temporary injunction may be issued to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co*., 84 S.W.3d 198, 204 (Tex. 2002). To obtain a temporary restraining order and temporary injunction, the applicant must plead and prove three specific elements:  (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Id.*; *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993); *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968). Orion's verified pleadings establish each of the required elements as described below.

93.    Orion is willing to post bond as deemed appropriate by the Court.

Certified Document Number: 87297813 - Page 20 of 27

94.     Orion has joined all indispensable parties under Texas Rule of Civil Procedure 39. Orion has provided Defendants with notice of this lawsuit and the fact that Orion is seeking injunctive relief against them and will provide notice of the time and place of such hearing.

**B.     Cause of Action**

95.     Orion has pled a cause of action for breach of the NDA and breach of the License Agreement against HT. The elements of a breach of contract claim are:  (1) existence of a valid contract; (2) performance or tender of performance by the plaintiff; (3) a breach of the contract by defendant; and (4) plaintiff sustained damages as a result of defendant's breach. *Frost Nat. Bank v. Burge*, 29 S.W.3d 580, 593 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

96.     Further, Orion has pled a cause of action for tortious interference with contract against Tokai. The elements of a claim for tortious interference are:  (1) the plaintiff had a valid contract; (2) the defendant willfully and intentionally interfered with the contract; (3) the interference proximately caused the plaintiff's injury; and (4) the plaintiff incurred actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002).

97.     Orion has pled facts supporting each of the elements of its claims for breach of the NDA, breach of the License Agreement, and tortious interference; therefore, Orion meets the first requirement to obtain a temporary injunction.

**C.     Probable Right to Relief Sought**

98.     To show a probable right of recovery, the applicant must plead a cause of action and present some evidence that tends to sustain it. *Camp v. Shannon*, 348 S.W.2d 517, 519 (Tex. 1961); *Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 897 (Tex. App.—Houston[1st Dist.] 2011, no pet.); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 23-24 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd). Orion need not

prove at this stage that it will ultimately prevail at trial. *See Intercontinental Terminals Co., LLC v. VopakN. Am., Inc.*, 354 S.W.3d 887, 897 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

99.    Orion stands to gain significant independent economic value from its exclusive use of SNOX technology for emission control. As described above, Orion spent years and nearly one million dollars pioneering this technology at a time it was generally believed (by vendors and customers) to be economically infeasible in the carbon black industry. Orion and HT entered into multiple separate agreements, including the NDA and Licensing Agreement, after years of significant negotiations to protect Orion's exclusive use of the technology. The exclusive use provides Orion a significant competitive advantage over its competitors, who are all currently required to spend approximately up to $100,000,000 per plant upgrading emissions control technology by April 2021.

100.    HT's breaches and Tokai's tortious interference are evidenced by independent third-party documentation submitted to the EPA describing Tokai's intended use of Orion's trade secret information to make required emissions upgrades to its Borger Texas plant. *See* Exhibit B. Moreover, HT admitted to having executed an agreement with Tokai to incorporate WSA, the material part of the SNOX technology, into Tokai's Borger Texas plant in violation of express contractual obligations not to do so. Tokai has likewise acknowledged that Orion has exclusive rights to HT's SNOX technology and patents covering same. Nevertheless, Tokai contracted with HT to use this technology without Orion's consent while knowing of Orion's rights in the technology and that Orion had not consented to its use of the technology.

101.    As set forth above, Orion has evidence of breach of contract and tortious interference based on the verified facts in this Petition. Additional evidence will be gathered and

Certified Document Number: 87297813 - Page 22 of 27

presented to the Court at the temporary injunction hearing through the expedited discovery requested by Plaintiffs.

**D.      Probable, Imminent, and Irreparable Injury**

102.    Injunctive relief is appropriate where a plaintiff will suffer probable injury that is imminent, irreparable, and for which there is no adequate remedy at law. *See Henderson v. KRTS, Inc.*, 822 S.W.2d 769, 773 (Tex. App.—Houston [1st Dist.] 1992, no writ). An irreparable injury is an injury that cannot be compensated in damages or measured by a pecuniary standard. *See Williams v. Compressor Eng'g Corp.*, 704 S.W.2d 469, 472 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). By the same token, if damages cannot be calculated for the complained-of harm, there is no adequate remedy at law. *See Tex. Indust. Gas. v. Phoenix Metallurgical Corp.*, 828 S.W.2d 529, 533 (Tex. App.—Houston [1st Dist.] 1992, no writ). A court may enforce contractual rights by injunction if the applicant presents evidence that monetary damages for an alleged breach would be inadequate. *Tex. Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 527 S.W.3d 579, 584 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

103.    Tokai is in the process of upgrading its Borger Texas plant with Orion's confidential and exclusive technology at this very moment. Tokai has already sought approval from the EPA to do so. *See* Exhibit B. Tokai's use of this technology will deprive Orion of the bargained-for competitive advantage it expected to receive through use of the technology, satisfying the test for imminent and irreparable harm. *See Texas Indus. Gas*, 828 S.W.2d at 533 (finding irreparable harm from breach of exclusivity agreement). Furthermore, "[i]rreparable harm may be established by evidence that disclosure of confidential information could enable competitors to mimic the marketing plans and strategies of the applicant and avoid the less successful strategies, resulting in a substantial competitive injury." *Marbrey v. Sandstream, Inc.*,

Certified Document Number: 87297813 - Page 23 of 27

124 S.W.3d 302, 319 (Tex. App.—Fort Worth 2003, no pet.) (internal quotation marks and citation omitted). This is precisely Orion's situation and why the harm in this case cannot be compensated by later damages from Defendants. Defendants' breaches and tortious interference poses a risk to Orion's ability to leverage its exclusive license of SNOX technology into future cost saving and strategic opportunities on improving emissions controls.

104.    The entire U.S. carbon black industry is currently undertaking significant emissions improvements as mandated by the EPA at a cost of up to $100,000,000 per affected plant. Orion has the opportunity to recognize a significant cost savings in connection with future emission control costs by utilizing its WSA adaptation over traditional wet gas scrubbing, estimated at approximately $90 per ton of carbon black production. This was a material competitive advantage over all other U.S. competitors that would have enabled Orion to offer more competitive pricing as a result of the significant production cost savings and thereby would have translated into substantial new business for Orion. Considering the capacity of Tokai's Borger plant at 130,000 MT, the production cost savings could be as much as $11,700,000 for a single year at the Borger plant alone. Orion further has the potential to commercialize its technology to other carbon black plants in exchange for tremendous economic value as evidenced by its negotiations to do so with Tokai prior to Defendants' breaching and tortious conduct. The potential loss of this commercial asset would be difficult or impossible to quantify. Given the difficulty to project or quantify the competitive advantage Orion could realize through use of the technology, Orion will be irreparably harmed without the requested injunctive relief. HT has expressly acknowledged the risk of irreparable harm to Orion if it breached the License Agreements. License Agreement § 9.1. Thus, there can be no serious dispute that Orion is

entitled to injunctive relief to immediately cease all further use or disclosure of its confidential information and to enforce its right to exclusive use of the technology.

**E.     Request for Injunctive Relief**

105.     Under Tex. Civ. Prac. & Rem. Code §§ 65.011 and general principles of equity, Orion asks the Court to grant a temporary injunction enjoining HT, and anyone formerly, currently, or in the future acting in concert with them:

a.     from directly or indirectly using any of Orion's Confidential Information for any purposes other than those described in the NDA and License Agreement;

b.     from directly or indirectly disclosing Orion's Confidential Information to any third party without first obtaining Orion's written consent unless certain limited exceptions, described in paragraph 6 of the NDA, are met; and

c.     from licensing, offering to license, making any commercial use of, or incorporating SNOX technology for use in any carbon black plant in the U.S., other than those owned by Orion, until December 31, 2020, including Tokai's Borger Texas plant.

106.     Under Tex. Civ. Prac. & Rem. Code §§ 65.011 and general principles of equity, Orion asks the Court to grant a temporary injunction enjoining Tokai, and anyone formerly, currently, or in the future acting in concert with them:

b.     from directly or indirectly disclosing Orion's Confidential Information, obtained from HT, to any third party;

c.     from incorporating HT's SNOX technology for use in any carbon black plant in the U.S.

**XII.     REQUEST FOR EXPEDITED DISCOVERY**

107.    Pursuant to Tex. R. Civ. P. 191.1, 196, 197, and 199, Orion respectfully moves to expedite discovery in this lawsuit. In order to prepare for the temporary injunction hearing, it is necessary that Orion have the opportunity to inspect documents now in Defendants' possession, custody or control on five (5) days' notice, serve Defendant with interrogatories to be answered on five (5) days' notice, and depose Defendants' witnesses in Houston, Texas on five (5) days' notice.

108.    "[T]he procedures and limitations set forth in the rules pertaining to discovery may be modified in any suit . . . by court order for good cause." Tex. R. Civ. P. 191.1. Orion has good cause for taking depositions, obtaining Defendants' documents, and serving Defendant with interrogatories in order to prepare its temporary injunction case.

109.    Accordingly, Orion prays for the entry of an order granting this expedited discovery before the temporary injunction hearing.

## XIII.    JURY DEMAND

110.    Orion demands a trial by jury on all issues so triable.

## XIV.    PRAYER

111.    For the foregoing reasons, Plaintiffs respectfully request the Court grant it the following relief:

a.    Enter an order granting expedited discovery in furtherance of Orion's requests for a temporary injunction;

b.    Set this matter for hearing on Orion's request for a temporary injunction as soon as possible;

c.    Upon hearing, enter temporary injunctive relief;

d.    Award Orion damages against Tokai; and

Certified Document Number: 87297813 - Page 26 of 27

e.    Award Orion all such other relief, at law or equity, to which it may show itself

entitled.

Dated:  September 25, 2019

Respectfully submitted,

**HOGAN LOVELLS US LLP**


By:  _/s/ Bruce Oakley_
Bruce D. Oakley
Texas Bar No. 15156900
bruce.oakley@hoganlovells.com
Lacy G. Brown
Texas Bar No. 24080906
lacy.brown@hoganlovells.com
609 Main Street, Suite 4200
Houston, Texas 77002
Telephone:    (713) 632-1400
Direct:    (713) 632-1420
Fax:    (713) 632-1401


***Counsel for Plaintiffs Orion Engineered Carbons, LLC and Orion Engineered Carbons GmbH***

Certified Document Number: 87297813 - Page 27 of 27

27



I, Marilyn Burgess, District Clerk of Harris County, Texas certify that this is a true and correct copy of the original record filed and or recorded in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this   September 26, 2019

Certified Document Number:        87297813 Total Pages:  27

Marilyn Burgess, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

2019-69832 / Court: 151

# Exhibit A

## LICENSE AGREEMENT

THIS AGREEMENT, effective as of the ............ day of ..................., 2018 (hereinafter referred to as the "EFFECTIVE DATE"), by and among HALDOR TOPSOE, INC., a company organized and existing under the laws of Texas, having its principal office at 17629 El Camino Real, Suite 300, Houston, Texas 77058 (hereinafter referred to as "HTI"), a daughter company of HALDOR TOPSØE A/S, a company organized and existing under the laws of Denmark, having its principal office at Haldor Topsøes Allé 1, DK-2800 Lyngby, Denmark (hereinafter referred to as "HTAS"), on the one hand, and ORION ENGINEERED CARBONS LLC, a company organized and existing under the laws of Delaware, having an office at 4501 Magnolia Cove Drive, Suite 106, Kingwood, Texas 77345 (hereinafter referred to as "OEC"), on the other hand, each of OEC and HTI being referred to herein as a "PARTY" and collectively as the "PARTIES."

WHEREAS, HTI controls certain proprietary rights relating to processes, catalysts, and equipment designs for the treatment of flue gases containing sulfur oxides and nitrogen oxides for the production of sulfuric acid and free nitrogen, including certain HTAS SNOX™ PROCESSES, which processes are defined in Appendix I, and has the right to grant rights of use under said proprietary rights;

WHEREAS, OEC has selected processes, catalysts, and equipment designs provided by HTI for a SNOX™ unit, to be integrated into an OEC carbon black plant at Ivanhoe, Louisiana (hereinafter referred to as the "OEC PLANT") with an initial design capacity for treating up to 284,064 normal cubic meters per hour of flue gas and therefore desires to obtain from HTI the right to use such processes, catalysts, and equipment designs within this facility (as further defined in Appendix I to this AGREEMENT and hereinafter referred to as the "LICENSED UNIT");

WHEREAS, HTI is willing and able to grant to OEC such a right;

WHEREAS, the PARTIES and/or their AFFILIATES have besides this License Agreement, entered into the Mutual Confidentiality Agreement as of September 3, 2015 (as amended from time to time, the "MUTUAL NDA") a current copy of which is set forth in Appendix III hereto, the Letter of Agreement as of 23 September 2015 (as amended from time to time, the "LETTER AGREEMENT"), a current copy of which is set forth in Appendix IV hereto, and OEC and HTI have contemporaneously with this AGREEMENT entered into the CATALYST SUPPLY AGREEMENT, the EQUIPMENT SUPPLY AGREEMENT, and the ENGINEERING AGREEMENT; and

WHEREAS, OEC will have the detailed design and/or construction of the LICENSED UNIT carried out under a contract with a contractor designated by OEC (hereinafter referred to as "CONTRACTOR").

NOW, THEREFORE, for and in consideration of the promises and the mutual covenants contained herein, the PARTIES agree as follows:

1.0    **DEFINITIONS**

1.1    The terms defined in Appendix I to this AGREEMENT shall, when used in this AGREEMENT and for all purposes of this AGREEMENT, have the meanings as specified in said Appendix I.

2.0    **LICENSE RIGHTS**

2.1    Subject to the terms and conditions of this AGREEMENT, as of the EFFECTIVE DATE, HTI grants to OEC the non-exclusive (subject to the exclusivity commitments in clause 4 of the LETTER AGREEMENT), non-transferable (except as set forth in sub-clause 11.3), worldwide right and license under any and all intellectual property and other proprietary rights CONTROLLED by HTI or any of its AFFILIATES (including HTAS) at any time during the term of this AGREEMENT as follows:

(a)    To have the LICENSED UNIT designed and built using HTAS TECHNICAL INFORMATION and engineering services of HTI to be supplied by HTI under the ENGINEERING AGREEMENT;

(b)    To use the HTAS CATALYSTS to be supplied by HTI in the LICENSED UNIT;

(c)    To use the HTAS EQUIPMENT to be supplied by HTI to OEC in the LICENSED UNIT;

(d)    To make, have made, offer to sell, sell, import, export to, and use in any country the products of the HTAS PROCESSES developed or produced by or arising or resulting from the LICENSED UNIT; and

(e)    To use, practice, maintain, and develop the HTAS PROCESSES and the HTAS TECHNICAL INFORMATION in connection with the operation of the LICENSED UNIT.

2.2    HTI and HTAS shall not, and shall ensure none of their AFFILIATES, successors or assignees shall directly or indirectly assert against OEC or any of its AFFILIATES as named in the MUTUAL NDA as amended in accordance with paragraph 16 of the MUTUAL NDA any patent or other intellectual property or proprietary right owned or CONTROLLED by HTI or any of its AFFILIATES (including HTAS) at any time during the term of this AGREEMENT or any time thereafter in connection with any activity of OEC, or any of its AFFILIATES as named in the MUTUAL NDA as amended in accordance with paragraph 16 of the MUTUAL NDA, pertaining to exercising the rights granted by HTI under this AGREEMENT, provided that OEC is in material compliance with the terms of this AGREEMENT and the MUTUAL NDA. This covenant will be binding upon any assignee or successor to HTI or the intellectual property or proprietary rights referenced herein, and HTI and HTAS will ensure that any such assignee or successor is bound in writing accordingly.

2.3    For clarity, and notwithstanding anything to the contrary in the PARTIES' AGREEMENTS, the license granted hereunder is not conditioned in any way upon the use

of HTAS CATALYSTS in the OEC PLANT other than the first full charge of HTAS CATALYSTS required for the LICENSED UNIT, and OEC is otherwise free to use any catalysts with the LICENSED UNIT as may be determined in OEC's sole discretion.





4



5



6



5.0    **RESTRICTION ON USE AND CONFIDENTIALITY**

5.1    The terms of the MUTUAL NDA as agreed on September 2, 2015 between Orion Engineered Carbons GmbH and HTAS and as acknowledged by HTI on September 3, 2015, as amended, shall apply to this AGREEMENT and all information exchanged pursuant thereto.

5.2    OEC may disclose information, data, or documentation (including HTAS TECHNICAL INFORMATION) relating to the LICENSED UNIT to the Environmental Protection Agency (the "EPA") or any other state or federal regulatory agency in reference to its dispute with the EPA (the EPA carbon black industry-wide enforcement initiative) or the EPA CONSENT DECREE, or in connection with OEC's permitting requirements relating to the LICENSED UNIT, or compliance with any related regulatory action or consent decree or court judgment requirement or request; <u>provided</u> that such information is requested or required by a federal or state LAW, regulatory agency (including the EPA), consent decree or judgment. To the extent permitted under applicable LAW and not otherwise prohibited by the EPA or such other regulatory agency, OEC shall take reasonable steps to: (i) limit disclosures of HTAS TECHNICAL INFORMATION to that which is reasonably necessary to comply with such requirement or request, (ii) ensure that all such disclosures are marked as business confidential (and ensure that all such disclosures comply with any requirements for marking trade secret or business confidential information or making claims concerning trade secret or business confidential information), (iii) ensure that such disclosures state that HTAS TECHNICAL INFORMATION was provided to OEC pursuant to a strict confidentiality agreement, (iv) ensure that any disclosures containing trade secret or business confidential information are submitted to the requesting agency under separate cover such that the HTAS TECHNICAL INFORMATION is easily separated from non-confidential submissions, and (v) identify to HTI and HTAS any such HTAS TECHNICAL INFORMATION that OEC has disclosed pursuant to this sub-clause 5.2. HTI and HTAS shall assist and support OEC in collecting and communicating such information, data, or documentation as reasonably requested by OEC.

6.0    **EXCLUSIVITY**

6.1    For certainty, the LETTER AGREEMENT and the Period of Exclusivity as defined in clause 4 of the LETTER AGREEMENT shall continue to apply. The PARTIES acknowledge and agree that the exclusivity provisions in clause 4 of the LETTER AGREEMENT are a material basis of this AGREEMENT and are hereby incorporated into and apply to this AGREEMENT, and nothing in this AGREEMENT will limit or modify such rights or obligations of the PARTIES.





9



10







9.0   **SPECIFIC PERFORMANCE**

9.1   Each of the PARTIES acknowledges and agrees that OEC may be irreparably harmed if any of the provisions of the PARTIES' AGREEMENTS are not performed in accordance with their specific terms or are otherwise breached, and that non-performance or breach of the PARTIES' AGREEMENTS could not be adequately compensated by monetary damages alone and that OEC would not have adequate remedy through the liquidated damages provisions set forth herein or otherwise at LAW. Accordingly, in addition to the other rights and remedies set forth under the PARTIES' AGREEMENTS to which OEC may be entitled, OEC shall be entitled to seek to enforce any provision of the PARTIES' AGREEMENTS by a decree of specific performance and to temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of the PARTIES' AGREEMENTS without posting any bond or other undertaking. HTI and HTAS agree that they will not contest the appropriateness of specific performance as a remedy.



12





14



15







## 12.0  LAW AND VENUE

12.1  This AGREEMENT shall be construed and the legal relations between the PARTIES shall be determined by the substantive law of the State of New York without regard to the conflict of law provisions or principles of such jurisdiction which would require or permit the application of the law of any other jurisdiction.

12.2  Any controversy or claim arising out of or relating to this AGREEMENT, or the breach, termination or validity thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its arbitration rules. The number of arbitrators shall be three, appointed in accordance with said rules, and the place of arbitration shall be New York, New York. The language of the arbitration shall be English, but documents or testimony may be submitted in another language if a translation is provided. The arbitration award rendered by the arbitrators shall be final and binding on the PARTIES. Judgment on the award may be entered in any court having jurisdiction thereof. The foregoing provisions shall not affect the right of any PARTY to apply to any court of competent jurisdiction for preliminary injunctive relief to safeguard the confidentiality or non-use provisions of this AGREEMENT.

12.3  If any conflict, inconsistency, or ambiguity exists between any of the PARTIES' AGREEMENTS and this AGREEMENT, or among any of the requirements or provisions thereof, the conflict, inconsistency, or ambiguity shall be resolved by applying the terms set forth in this AGREEMENT. With respect to the subject matter of the MUTUAL NDA, the MUTUAL NDA will govern. With respect to the relationship of exclusivity between the parties, the LETTER AGREEMENT will govern.







18





14.0  **NOTICE**

14.1  All notices and other communications described or required hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or if by e-mail, upon written confirmation of receipt by e-mail or otherwise, (b) on the first business day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth business day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

    For HTI:           HALDOR TOPSOE, INC.
                          17629 El Camino Real, Suite 300
                          Houston, Texas 77058
                          Attn:  Mr. Henrik Rasmussen
                          email: HWR@topsoe.com
                          Copy to: Chief Executive Officer
                          email:  ANO@topsoe.com



For OEC:                ORION ENGINEERED CARBONS LLC
                        4501 Magnolia Cove Drive, Suite 106
                        Kingwood, Texas  77345
                        Attn:  Messrs. Christian Eggert and Mark Peters
                        email: christian.eggert@orioncarbons.com;
                               mark.peters@orioncarbons.com
                        Copy to: Messrs. Daniel Horn and David Deters
                        email: daniel.horn@orioncarbons.com;
                               david.deters@orioncarbons.com


                        *[Signature Page Follows]*


20



IN WITNESS WHEREOF, the PARTIES hereto have caused their representatives, duly authorized for that purpose, to execute this AGREEMENT on the dates and in the year here below written.

ORION ENGINEERED CARBONS LLC:

By: _____

Name: _____ Jok CLEM

Title: _____ CEO

Date: _____ 9 April 2018

HALDOR TOPSOE, INC.:

By: _____

Name: _____ Morten Schaldemose
~~Executive VP, Refinery~~

Title: _____

Date: 6. April 2018

21



Appendix I-1



Appendix I-2



Appendix I-3



Appendix I-4



Appendix II-1





Appendix II-2





Appendix II-3



Appendix II-4



Appendix II-5



Appendix II-6

# APPENDIX III

## MUTUAL NDA (AS AMENDED)

### Mutual Confidentiality Agreement

Orion Engineered Carbons GmbH, Hahnstraße 49, 60528 Frankfurt am Main, ("OEC") has expressed an interest in obtaining technical information on the SNOX™ technology for treatment of sulfur oxides and nitrogen oxides containing flue gas of Haldor Topsøe A/S, Haldor Topsøes Allé 1, 2800 Kgs. Lyngby, Denmark, ("HTAS") in order to evaluate its incorporation in an air pollution control project at the OEC plant located in Borger, Texas (the "Project"), or some other OEC plant, or plants, which the parties agree in writing will be covered by this Agreement, each of which shall be considered a separate Project. For this purpose HTAS is prepared to disclose to OEC, either directly or through a party authorized by HTAS to do so, the necessary proprietary technical information relating to HTAS' said technology, which HTAS has developed over many years and in which HTAS has invested substantial time and money. HTAS understands that HTAS will receive from OEC information regarding the Project which are necessary for the performance of HTAS' services for OEC. These OEC information concerning the carbon black business have been developed by OEC over many years and in which OEC has invested substantial time and money. Furthermore, the parties acknowledge that each party may develop improvements and make inventions to the other party's technology in connection with implementing or adapting HTAS PROCESSES (defined below) and to the OEC PROCESSES (defined below). In consideration of the disclosures of each Party, OEC and HTAS each agree to accept the following terms and conditions:

1.    HTAS PROCESSES, as used herein, shall mean:

HTAS SNOX™ PROCESSES, which for this agreement shall mean any or all processes for treatment of sulfur oxides and nitrogen oxides containing flue gases under production of sulfuric acid and free nitrogen, including incineration or combustion that occur at or downstream of the entrance flange to the sulfur oxides oxidation reactor, dust removal that occurs at or downstream of the entrance flange to the sulfur oxides oxidation reactor, catalytic reduction of nitrogen oxides that occur at or downstream of the entrance flange to the nitrogen oxides reduction reactor, catalytic oxidation of sulfur compounds that occurs at or downstream of the entrance flange to the sulfur oxides oxidation reactor, absorption that occurs at or downstream of the entrance flange to the sulfur oxides oxidation reactor, sulfuric acid condensation and concentration that occurs at or downstream of the entrance flange to the sulfur oxides oxidation reactor, and heat exchange that occurs at or downstream of the entrance flange to the sulfur oxides oxidation reactor, which processes are operated under use of catalysts and/or process technology developed by HTAS and/or conducted in equipment of HTAS' design that occur at or downstream of the entrance flange to the respective reactor, as specified above.

2.    OEC PROCESSES, as used herein, shall mean:

OEC PROCESSES, which for this agreement shall mean any or all processes related to the production of carbon black that occur upstream of the entrance flange to sulfur oxides oxidation reactor excluding from the inlet flange to the outlet flange of the nitrogen oxides reduction reactor. For the case of any heat exchange of these processes with any HTAS SNOX™ PROCESSES, the resultant streams are designated as OEC PROCESSES.

3.    HTAS TECHNICAL INFORMATION, as used herein, shall mean data, plans, specifications, flow sheets, drawings, instructions, and similar information relating to HTAS PROCESSES.

4.    OEC CONFIDENTIAL INFORMATION, as used herein, shall mean data, know-how, trade secrets, formulae, processes, specifications and similar information related to OEC's carbon black technology, the OEC PROCESSES and all commercial information which OEC provides to HTAS pursuant to this Agreement and related to the Project.

5.    CONFIDENTIAL INFORMATION, as used herein, shall mean HTAS TECHNICAL INFORMATION and/or OEC CONFIDENTIAL INFORMATION. The confidentiality obligations



under this Agreement do not depend on the actual marking of the provided information as "Confidential" but are existent also with regard to CONFIDENTIAL INFORMATION not marked as "Confidential."

6.  In connection with the disclosure by either Party that is disclosing CONFIDENTIAL INFORMATION ("Disclosing Party") to the other Party that receives CONFIDENTIAL INFORMATION ("Receiving Party") pursuant to this Agreement, Receiving Party agrees to hold in confidence and not to disclose to any third party any part of CONFIDENTIAL INFORMATION disclosed by Disclosing Party to Receiving Party, directly or indirectly, in writing or otherwise, except such parts:

    (a)  which at the time of the disclosure to Receiving Party by Disclosing Party are in the public domain, or which later on become part of the public domain through no fault of Receiving Party;

    (b)  which Receiving Party can show were in Receiving Party's possession free of obligations of confidentiality to third parties prior to the disclosure to Receiving Party by Disclosing Party and were not previously obtained by Receiving Party directly or indirectly from Disclosing Party; or

    (c)  which Receiving Party can show were received by Receiving Party free of obligations of confidentiality after the time of the disclosure hereunder from a third party who had a lawful right to disclose the same to Receiving Party and who did not acquire such information directly or indirectly from Disclosing Party.

    Notwithstanding the foregoing, Receiving Party shall be authorized to disclose CONFIDENTIAL INFORMATION of the Disclosing Party which is required to be disclosed to a governmental agency, judicial body or third party by legal process, under applicable laws, rules or regulations, a governmental order or decree, a ruling or judgment of a court of competent jurisdiction, or the rules of any recognized stock exchange (but only to the extent of such requirement) provided that, if permitted by law, reasonable notice is given to Disclosing Party of any such requirement or request to permit Disclosing Party to seek an appropriate protective order or exemption from such requirement or request.

7.  It is understood that specific CONFIDENTIAL INFORMATION disclosed to Receiving Party by Disclosing Party shall not be deemed to be within any of the three exceptions (a), (b), and (c) of Paragraph 6 of this Agreement, merely because it is embraced by more general information within any one or more of these exceptions. Furthermore, any combination of features shall not be deemed to be within these exceptions, unless the combination itself is within any one or more of these exceptions.

Appendix III-2





12.    OEC agrees to make no commercial use of and not to incorporate in any plant any part of HTAS TECHNICAL INFORMATION, except if within any of the three exceptions (a), (b), and (c) of Paragraph 8 of this Agreement, or except if specifically agreed to by HTAS in a license agreement. HTAS agrees to make no commercial use of and not to incorporate in any plant (other than a plant for OEC) any part of OEC CONFIDENTIAL INFORMATION, except if within any of the three exceptions (a), (b), and (c) of Paragraph 8 of this Agreement, or except if specifically agreed to by OEC in writing.



RESEARCH | TECHNOLOGY | CATALYSTS

Appendix III-3





15.    The Receiving Party shall not copy or reproduce in whole or in part any CONFIDENTIAL INFORMATION of the Disclosing Party provided hereunder other than as necessary for the above purpose. The Receiving Party shall make only faithful copies of the CONFIDENTIAL INFORMATION of the Disclosing Party and reproduce and include all proprietary, confidentiality, trade secret, and other notices on all such copies of the CONFIDENTIAL INFORMATION of the Disclosing Party.

16.    Each Party may involve one or more of its Affiliates (as defined below) in the supply, receipt, and use of CONFIDENTIAL INFORMATION of the Disclosing Party under the Agreement only if this is necessary to accomplish the purpose as described in this Agreement and only when meeting the further prerequisites described below. For the purposes of this Agreement, an "Affiliate" of a Party means any entity directly or indirectly controlling, or controlled by, or under common control with, such Party but excludes entities which are competitors of the Disclosing Party. Each Party is responsible for its Affiliates' compliance with the terms of this Agreement. Each Receiving Party will inform the Disclosing Party of the identity of the Affiliates of the Receiving Party to which the CONFIDENTIAL INFORMATION of the Disclosing Party is to be disclosed. Hereby, HTAS informs OEC that its Affiliate, Haldor Topsoe, Inc., will receive OEC CONFIDENTIAL INFORMATION. Hereby, OEC informs HTAS that the following Affiliates of OEC will receive HTAS TECHNICAL INFORMATION:

RESEARCH | TECHNOLOGY | CATALYSTS

Appendix III-4



| | |
|---|---|
| | Orion Engineered Carbons S.A., Luxembourg |
| | Orion Engineered Carbons Holdings GmbH, Frankfurt am Main, Germany |
| | Orion Engineered Carbons Bondco GmbH, Frankfurt am Main, Germany |
| | Orion Engineered Carbons International GmbH, Frankfurt am Main, Germany |
| | Orion Engineered Carbons Holdco S.r.L, Ravenna, Italy |
| | Orion Engineered Carbons France Holdco SAS, Paris, France |
| | Blackstar Engineered Carbons Portugal Holdco, Unipessoal, Lda., Sines, Portugal |
| | Orion Engineered Carbons USA Holdco, LLC, Kingwood, USA |
| | Orion Engineered Carbons Korea Holdco Co., Ltd., Bupyeong-gu, South Korea |
| | Norcarb Engineered Carbons Sweden HoldCo AB, Malmö, Sweden |
| | Orion Engineered Carbons S.r.l. Italy, Ravenna, Italy |
| | Orion Engineered Carbons S.A.S. France, Ambès, France |
| | Carbogal Engineered Carbons S.A. Portugal, Sines, Portugal |
| | Orion Engineered Carbons LLC USA, Kingwood, USA |
| | Orion Engineered Carbons Co. Ltd. Korea, Bupyeong-gu, South Korea |
| | Orion Engineered Carbons sp. z o.o. Poland, Jaslo, Poland |
| | Norcarb Engineered Carbons AB Sweden, Malmö, Sweden |
| | Orion Engineered Carbons Ltda. Brazil, São Paulo, Brazil |
| | Orion Engineered Carbons Proprietary Limited South Africa, Port Elizabeth, South Africa |
| | Orion Engineered Carbons KK Japan, Tokyo, Japan |
| | Orion Engineered Carbons Pte. Ltd., Singapore, Singapore |
| | Orion Engineered Carbons Trading Co. Ltd., Shanghai, China |
| | CB International Services Company GmbH, Frankfurt, Germany (formerly Carbon Black HoldCo GmbH, Essen, Germany) |

The duty to inform the Disclosing Party of the identity of the Affiliates of the Receiving Party to which the CONFIDENTIAL INFORMATION of the Disclosing Party is to be disclosed does not extend to the case of an employee of Receiving Party who is also an employee of an Affiliate of the Receiving Party, it being understood that no further disclosures to the Affiliate are thereby authorized unless the Affiliate has been identified to the Disclosing Party. CONFIDENTIAL INFORMATION received from a Disclosing Party's Affiliates must be treated the same as CONFIDENTIAL INFORMATION received from that Disclosing Party. Dissemination of the Disclosing Party's CONFIDENTIAL INFORMATION by the Receiving Party shall be limited to Affiliates of the Receiving Party whose duties justify their need to know of such information and then only on the basis of a clear commitment of these Affiliates to maintain the trade secret status of such information and to restrict the use of such information solely to the use granted to the Receiving Party under this Agreement and to abide by the terms and provisions of this Agreement.

17. While the amount of OEC CONFIDENTIAL INFORMATION to be disclosed is completely within the discretion of OEC, all disclosures hereunder shall be completed within 24 (twenty-four) months of the date on which it has been fully executed by both Parties unless such time is extended by mutual agreement of the Parties. Each Party is entitled to terminate the present Agreement in advance by giving not less than 1 (one) month' prior written notice to the other Party. Notwithstanding anything to the contrary contained herein, the provisions of Paragraphs 7 to 19 of this Agreement and Receiving Party's obligations of secrecy, non-disclosure and limited use defined under Paragraphs 1 to 6 shall survive the expiration or termination of this Agreement

Page 6 of 7

and shall remain valid for 25 (twenty five) years after the expiration or termination of this Agreement.

Neither Party may assign the present Agreement, whether by operation of law or otherwise, without the prior written consent of the other Party, which consent shall not be unreasonably withheld.

Each Party's rights and obligations under the present Agreement shall inure to the benefit of and shall be binding upon a permitted assignee.

18.    This Agreement shall be governed by and construed in accordance with the laws of Denmark without giving effect to its conflicts of law rules.

19.    In the event that any provision of this Agreement shall be invalid, the invalid provision shall be replaced by a valid provision, which will come closest in meaning and substance to the invalid provision.  The remaining provisions of this Agreement shall not be affected by the invalidity of individual provisions and shall remain in full force and effect unless such invalid provision is of such essential importance to this Agreement that the Parties could not be reasonable expected to have concluded the Agreement without the invalid provision.

Accepted and Agreed to by:

HALDOR TOPSØE A/S

By: _____

Name: Lene Ramm

Title: General Counsel

Date: September 2, 2015

ORION ENGINEERED CARBONS GMBH:

By: _____

Name: ppa. Dr. Christian Eggert

Title: General Counsel

Date: _____

By: _____

Name: ppa. Eric Thiry

Title: EVP Business Development

Date: _____

RESEARCH | TECHNOLOGY | CATALYSTS



Appendix III-6

Page 7 of 7

## ENDORSEMENT BY HALDOR TOPSOE, INC.

We, Haldor Topsøe, Inc., confirm that we have read and understood this Agreement and hereby undertake the same obligations of non-disclosure and non-use as Haldor Topsøe A/S has undertaken under this Agreement.

HALDOR TOPSOE, INC.

By: _____
     Anders N. Olsen, Chief Executive Officer

Date: _____

RESEARCH | TECHNOLOGY | CATALYSTS

Appendix III-7

CONFIDENTIAL

March 21, 2018

HALDOR TOPSØE A/S
Haldor Topsøes Allé 1
DK-2800 Lyngby, Denmark
Attention: Chief Executive Officer

HALDOR TOPSOE, INC.
17629 El Camino Real, Suite 300
Houston, Texas 77058
Attention: Chief Executive Officer

Subject:        Amendment to Mutual NDA

This letter (the "Amendment") is to inform Haldor Topsøe A/S ("HTAS") and Haldor Topsoe, Inc. ("HTI") that Orion Engineered Carbons GmbH ("OEC") would like to make an amendment to the Mutual Confidentiality Agreement, dated September 3, 2015 (the "Mutual NDA"), as set forth below.

The Parties agree as follows:

1.1     The terms of the Mutual NDA, as amended hereby, shall apply to any CONFIDENTIAL INFORMATION (as defined in the Mutual NDA) exchanged between OEC and its affiliates, on the one hand, and HTI, and HTAS and their respective affiliates, on the other hand, pursuant to and for the purpose of any activity authorized under any agreements entered into by the Parties or their respective affiliates (the "Purpose").

1.2     Any reference to "purpose" within the Mutual NDA will be deemed to refer to the Purpose as defined in sub-clause 1.1 above, and the Mutual NDA will remain in full force and effect through the end of the term of the last to expire (or to be terminated) license agreement between the Parties for the provision of technology for any "Project" (such period, the "NDA Term"). Notwithstanding anything to the contrary contained in the Mutual NDA, the provisions of Paragraphs 7 to 19 of the Mutual NDA and Receiving Party's obligations of secrecy, non-disclosure and limited use defined under Paragraphs 1 to 6 of the Mutual NDA shall survive and shall remain valid for 25 (twenty five) years after the expiration of NDA Term.

CONFIDENTIAL

1.3    Despite the restrictions on disclosure in the Mutual NDA, but only in connection with the Purpose, OEC may disclose HTAS TECHNICAL INFORMATION (as defined in the Mutual NDA):

(a)    to a third party to which OEC intends to disclose a process flow diagram, a piping and instrumentation diagram and/or the process description document provided by HTI or HTAS, provided such third party has first signed an agreement with OEC containing appropriate restrictions on use, copying and disclosure no less onerous than those undertaken by OEC under the Mutual NDA;

(b)    to a third party to which OEC intends to disclose only one individual standard equipment data sheet, provided such third party has first been identified to HTAS by OEC in writing and has signed an agreement with OEC containing restrictions on use, copying and disclosure no less onerous than those undertaken by OEC under the Mutual NDA; or

(c)    to a third party to which OEC intends to disclose only more than one individual standard equipment data sheet, provided such third party has first been identified to HTAS by OEC in writing and, as HTAS may direct in its sole discretion, has first either: (i) signed an agreement with HTAS containing appropriate restrictions on use, copying and disclosure, or (ii) signed an agreement with OEC containing restrictions on use, copying and disclosure no less onerous than those undertaken by OEC under the Mutual NDA. HTAS shall not withhold or unreasonably delay indicating its choice regarding one of the two foregoing options following the receipt of the related notice from OEC.

For certainty, the third parties identified in this sub-clause 1.3 may use such HTAS TECHNICAL INFORMATION solely for the Purpose, subject to the confidentiality obligations described above, within the scope of the right and license granted to OEC under any license or other agreement between the Parties or their affiliates. In each case OEC will inform HTAS of the identity of the third party to which the HTAS TECHNICAL INFORMATION is to be disclosed, and in the event that such third party has not signed a separate non-disclosure with HTAS, cf. sub-clause 1.3(c) above, OEC agrees to be liable toward HTAS for such third party's breach of the restrictions on use, copying and disclosure.

CONFIDENTIAL

███████████████████████████████████████

1.7    Except as specifically amended herein, all terms, conditions and provisions contained in the Mutual NDA shall remain unchanged and in full force and effect.

1.8    This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same agreement.  A signed copy of this Amendment delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Amendment.

If you are in agreement with the above, please indicate your acceptance by signing and returning one copy of this Amendment to me.

Very truly yours,

[●]

Orion Engineered Carbons GmbH

Understood and agreed to this _6_ day of _April_, 2018.

HALDOR TOPSOE, INC.:

By: _____

Name: _____Anders N. Olsen_____

Title: _____Chief Executive Officer_____

Date: _____April 5, 2018_____

HALDOR TOPSØE A/S:

By: _____

Name: _____Morten Schaldemose_____
               Executive VP, Refinery

Title: _____

Date: _____6. April 2018_____

# APPENDIX IV

## LETTER AGREEMENT



September 15, 2015

Haldor Topsøe A/S
Haldor Topsøes Allé 1
DK 2800 Lyngby
Denmark
Attention: Chief Executive Officer

Haldor Topsoe, Inc.
17629 El Camino Real, Suite 300
Houston, Texas 77058
Attention: Chief Executive Officer

Subject:   Letter of Agreement - Air Pollution Control Project at an Orion Engineered
           Carbons GmbH Carbon Black Plant located in North America Incorporating
           SNOX™ Technology of Haldor Topsøe A/S

Gentlemen:

This letter when executed by you shall constitute an agreement ("Agreement") between Orion
Engineered Carbons GmbH ("OEC"), Haldor Topsøe A/S ("HTAS"), and Haldor Topsoe, Inc.
("HTI" with HTI and HTAS collectively referred to as "Topsoe") under which Topsoe shall be
authorized to proceed after execution of the mutually agreed upon Confidentiality Agreement
with performance of the work specified in Exhibit A.





Appendix IV-1

This Agreement is subject to the following terms and conditions:

1. Upon execution of this Agreement and the mutually agreed upon Confidentiality Agreement by all parties, HTI shall be authorized to proceed with the services related to the Testing specified in Exhibit A. The delivery schedule, cost, and related payment terms for the services specified in Exhibit A shall be as specified in Exhibit A.

2. Upon execution of this Agreement by all parties and the written release by OEC to proceed, HTI shall be authorized to proceed with engineering to provide the Engineering Package specified in Exhibit B. The delivery schedule, cost, and related payment terms for the Engineering Package specified in Exhibit B shall be as specified in Exhibit B.

3. Upon OEC's decision to proceed with the Project, Topsoe and OEC will negotiate in good faith to enter into the agreements for the TSSS based upon pricing, terms, and conditions mutually acceptable to both parties. The License Agreement granting a license to the SNOX™ technologies will be signed between OEC and HTAS, whereas all other agreements for the balance of the TSSS (i.e., engineering package, supply of proprietary equipment, supply of catalysts, and technical site service) will be signed between OEC and HTI.

4. Subject to the following conditions, Topsoe agrees that it will not license another installation of HTAS' SNOX™ technology[1] for use in any carbon black plant located within the continental United States not operated by OEC for the following periods (hereinafter referred to "Period of Exclusivity"):

   a. If on or before October 1, 2015, OEC initiates or completes the Testing and authorizes HTI to perform the work to prepare the Engineering Package for the Project specified in Exhibit B , the Period of Exclusivity shall commence on the date this Agreement becomes effective and shall extend through July 31, 2016;

   b. If the agreements for the TSSS for the Project becomes effective on or before July 31, 2016, the Period of Exclusivity shall extend through December 31, 2020;

   c. If the agreements for the TSSS for one or more additional OEC projects become effective during a then current Period of Exclusivity, the Period of Exclusivity shall extend two (2) additional years for each additional OEC project for which agreements for TSSS are executed within the then current Period of Exclusivity.

5. All amounts specified to be paid to Topsoe are net amounts after deduction of any direct or indirect taxes (including but not limited to income tax, business tax, value added and turnover tax) and duties.

6. This Agreement shall not be construed as granting to OEC any rights or licenses relating to HTAS' technology, however, subject to the limitations specified in this Agreement,

---
[1] For purposes of this Letter Agreement, HTAS SNOX™ technology shall mean the combination of all HTAS' processes as defined by the mutually agreed upon Confidentiality Agreement.



Appendix IV-2

OEC may use such technology for the purpose of evaluating whether to proceed with the Project. All documents and other information provided by Topsoe under this Agreement shall be subject to the obligations of confidentiality and limited use as set forth in that certain Confidentiality Agreement between OEC and HTAS.

7. The contents of this Agreement shall remain confidential. Neither party will reveal or disclose any information relating hereto to any person or entity that is not a party to this Agreement (other than the party's attorneys, accountants, employees, agents, and except as required by legal process), without the prior written consent of the other party nor the fact that discussions or negotiations are taking place concerning the matters contained herein.

8. This Agreement shall not be construed as granting Topsoe any rights or licenses relating to OEC's technology. All documents and other information provided by OEC under this Agreement shall be subject to the obligations of confidentiality and limited use as set forth in the certain Confidentiality Agreement between OEC and HTAS.

9. Topsoe warrants it shall perform its services in accordance with the current standards of care and diligence normally practiced by recognized firms in performing services of a similar nature. If, during the six (6) month period following the completion of the services it is shown that there is an error in the services as a result of Topsoe's failure to meet those standards, and OEC has notified Topsoe in writing of any such error within that period, Topsoe shall perform such corrective services within the original scope of services as may be necessary to remedy such error.

10. TOPSOE SHALL NOT BE RESPONSIBLE OR HELD LIABLE TO OEC UNDER THIS AGREEMENT FOR INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOSS OF PROFIT, LOSS OF INVESTMENT, LOSS OF PRODUCT OR BUSINESS INTERRUPTION, HOWSOEVER CAUSED. EXCEPT IN THE CASE OF TOPSOE'S GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT, OR IF OTHERWISE REQUIRED BY LAW, REGARDLESS OF ANY OTHER PROVISION OF THIS AGREEMENT, IT IS UNDERSTOOD THAT THE TOTAL FINANCIAL LIABILITY OF TOPSOE FOR ANY AND ALL REASONS UNDER THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNT ACTUALLY PAID BY OEC TO TOPSOE UNDER THE TERMS OF THIS AGREEMENT.

11. The interpretation and construction of this Agreement shall be governed by and construed in accordance with the laws of England, without reference to the conflicts of law or rules that would apply the laws of another jurisdiction.

12. Except as specified in this Agreement, this Agreement sets forth the full and complete agreement of the parties as to the subject matter hereof. In the event of any ambiguity in any of the terms or conditions of this Agreement, including any exhibits hereto, such ambiguity shall not be construed for or against any party hereto on the basis that such party did or did not author the same.





Appendix IV-3

If you are in agreement with the above, please indicate your acceptance by signing and returning one copy of this letter to me at the address on this letterhead.

Very truly yours,

Jack Clem
Chief Executive Officer
**ORION ENGINEERED CARBONS GMBH**

Understood and Agreed to this 23rd day of Sept., 2015

**HALDOR TOPSØE A/S**

By:
Name: NIELS JART WACKSEN
Title: EVP — E&U

**HALDOR TOPSOE, INC.**

By:
Name: Anders N. Olsen
Title: Chief Executive Officer





Appendix IV-4





Appendix IV-5



Appendix IV-6





Appendix IV-7

Appendix IV-8



Appendix IV-9





Appendix IV-10



Appendix IV-11



September 28, 2015

Haldor Topsoe, Inc.
17629 El Camino Real, Suite 300
Houston, Texas 77058
Attention: T. Nathan White

Subject:     Change in Clause 10 of Letter of Agreement

Nathan:

This letter is to inform Haldor Topsoe A/S ("HTAS") and Haldor Topsoe, Inc. ("HTI" with HTI and HTAS collectively referred to as "Topsoe") that Orion Engineered Carbons GmbH ("OEC") would like to make an inclusion to Clause 10 of the Letter of Agreement dated September 15, 2015.

Clause 10 from Letter of Agreement dated September 15, 2015:

> 10. TOPSOE SHALL NOT BE RESPONSIBLE OR HELD LIABLE TO OEC UNDER THIS AGREEMENT FOR INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOSS OF PROFIT, LOSS OF INVESTMENT, LOSS OF PRODUCT OR BUSINESS INTERRUPTION, HOWSOEVER CAUSED, EXCEPT IN THE CASE OF TOPSOE'S GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT, OR IF OTHERWISE REQUIRED BY LAW, REGARDLESS OF ANY OTHER PROVISION OF THIS AGREEMENT, IT IS UNDERSTOOD THAT THE TOTAL FINANCIAL LIABILITY OF TOPSOE FOR ANY AND ALL REASONS UNDER THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNT ACTUALLY PAID BY OEC TO TOPSOE UNDER THE TERMS OF THIS AGREEMENT.

Proposed change to Clause 10 in Letter of Agreement:

> 10. TOPSOE SHALL NOT BE RESPONSIBLE OR HELD LIABLE TO OEC UNDER THIS AGREEMENT FOR INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOSS OF PROFIT, LOSS OF INVESTMENT, LOSS OF PRODUCT OR BUSINESS INTERRUPTION, HOWSOEVER CAUSED, EXCEPT IN THE CASE OF TOPSOE'S GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT, OR IF OTHERWISE REQUIRED BY LAW, EXCEPT IN THE CASE OF TOPSOE'S GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT, OR IF OTHERWISE REQUIRED BY LAW, REGARDLESS OF ANY OTHER PROVISION

Appendix IV-12

OF THIS AGREEMENT, IT IS UNDERSTOOD THAT THE TOTAL FINANCIAL LIABILITY OF TOPSOE FOR ANY AND ALL REASONS UNDER THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNT ACTUALLY PAID BY OEC TO TOPSOE UNDER THE TERMS OF THIS AGREEMENT.

If you are in agreement with the above change to Clause 10, please indicate your acceptance by signing and returning one copy of this letter to me.

Very truly yours,

Dr. Rodney Taylor
Vice President of Process Development
Innovation
Orion Engineered Carbons GmbH

Understood and Agreed to this __7th__ day of __October__ 2015

**HALDOR TOPSOE A/S**

By: _____
Name: PETER HOLT KNUDSEN
Title: EVP – EEO

**HALDOR TOPSOE, INC.**

By: _____
Name: Anders N. Olsen
Title: Chief Executive Officer

Appendix IV-13



Appendix IV-14



Appendix IV-15





Appendix IV-16



Appendix IV-17

Appendix IV-18



Appendix IV-19



Appendix IV-20



Appendix IV-21



Appendix IV-22



Appendix IV-23



Appendix IV-24

Appendix IV-25



Appendix IV-26

Appendix IV-27

Page 2 of 4

Appendix IV-28



Page 3 of 4

Appendix IV-29

Appendix IV-30



Appendix IV-31



Page 2 of 4

Appendix IV-32



Page 3 of 4

Appendix IV-33



Page 4 of 4

Appendix IV-34



Appendix IV-35



Page 2 of 4

Appendix IV-36



Page 3 of 4

Appendix IV-37



Page 4 of 4

Appendix IV-38



Appendix IV-39



Page 2 of 4



Page 3 of 4

Appendix IV-41



Page 4 of 4

Appendix IV-42



April 4, 2018

Haldor Topsøe A/S
Haldor Topsøes Allé 1
DK 2800 Lyngby
Denmark
Attention: Chief Executive Officer

Haldor Topsoe, Inc.
17629 El Camino Real, Suite 300
Houston, Texas 77058
Attention: Chief Executive Officer

Subject: Amendment No. 7 to the Letter of Agreement (re: Clause 4)

Gentlemen:

This letter is to inform Haldor Topsøe A/S ("HTAS") and Haldor Topsoe, Inc. ("HTI") (with HTI and HTAS collectively referred to as "Topsoe") that Orion Engineered Carbons GmbH ("OEC") would like to make an amendment to Clause 4 of the Letter of Agreement dated September 15, 2015 (the "Letter of Agreement"), and extend the coverage of the Mutual Confidentiality Agreement between OEC and HTAS, signed on behalf of HTAS on September 2, 2015 (the "Mutual Confidentiality Agreement"). If and when executed by HTAS, HTI and OEC, this letter shall become referred to as Amendment No. 7 to the Letter of Agreement ("Amendment 7"), dated as of the date set forth above, between HTAS, HTI and OEC, and shall amend the Letter of Agreement (as previously amended) in accordance with the terms set forth herein.

It is understood that Clause 4 of the Letter of Agreement, as amended by Amendment No. 6 to Clause 4 of the Letter of Agreement, dated November 27, 2017, as executed by and between HTAS, HTI and OEC, is written as follows:

4.      Subject to the following conditions, Topsoe agrees that it will not license another installation of HTAS' SNOX™ technology for use in any carbon black plant located within the continental United States not operated by OEC for the following periods (hereinafter referred to "Period of Exclusivity"), and OEC agrees and acknowledges that within the continental United States it is working exclusively with the HTAS' SNOX™ technology as its air quality control technology:

a.      If on or before October 1, 2015, OEC initiates or completes the Testing and authorizes HTI to perform the work to prepare the Engineering Package for the Project specified in Exhibit B, the Period of Exclusivity shall commence on the date this Agreement becomes effective and shall extend through July 31, 2016;

b.  If on or before July 31, 2016, OEC authorizes HTI to perform the work to prepare the Engineering Package for the OEC Belpre Project specified in Exhibit C, which shall be considered a "Project" for all purposes related to this Agreement, the Period of Exclusivity shall extend through March 31, 2017;

c.  If, on the basis of 4a and 4b, a period of exclusivity is in place, and the negotiations for the license, engineering services, equipment supply, and catalyst supply agreements are ongoing, the parties agree to extend the Period of Exclusivity through the negotiations, but no longer than February 28 , 2018;

d.  If the agreements for the TSSS for either the OEC Project or any other Project becomes effective on or before February 28, 2018, the Period of Exclusivity shall extend through December 31, 2020;

e.  If the agreements for the TSSS for one or more additional OEC projects become effective during a then current Period of Exclusivity, the Period of Exclusivity shall extend two (2) additional years after start-up for each additional OEC project for which agreements for TSSS are executed within the then current Period of Exclusivity.

f.  Both Parties agree that the events described in Clause 4 lit. a. and b. have occurred, and therefore agree to extend the Period of Exclusivity through February 28, 2018.

Clause 4 of Letter of Agreement is hereby amended and restated in its entirety as follows:

4.  Subject to the following conditions and for the following periods (hereinafter referred to "Period of Exclusivity"), (i) Topsoe agrees that it will not license another installation of HTAS' SNOX$^{TM}$ technology for use in any carbon black plant located within the continental United States not operated by OEC, and (ii) OEC agrees and acknowledges it is working exclusively with the HTAS' SNOX$^{TM}$ technology as its air quality control technology for the OEC Ivanhoe plant, and for any other OEC plant subject to the technical and commercial attractiveness of the HTAS' SNOX$^{TM}$ technology to OEC at the relevant time:

a.  If on or before October 1, 2015, OEC initiates or completes the Testing at OEC Malmo plant and authorizes HTI to perform the work to prepare the Engineering Package for the OEC Ivanhoe plant specified in Exhibit B, the Period of Exclusivity shall commence on the date this Agreement becomes effective and shall extend through July 31, 2016;

b.  If on or before July 31, 2016, OEC authorizes HTI to perform the work to prepare the Engineering Package for the OEC Belpre plant specified in Exhibit C, the Period of Exclusivity shall extend through March 31, 2017;

c.  If, on the basis of sub-clauses 4(a) and 4(b), a Period of Exclusivity is in place, and the negotiations for the license, engineering services, equipment supply, and catalyst supply agreements for OEC Ivanhoe plant are ongoing, the parties agree to extend the Period of Exclusivity through the negotiations, but no longer than April 9, 2018. Both Parties agree that the events described in sub-clause 4 (a) and (b) hereof are deemed to have occurred and the negotiations for the agreements (License, Engineering, Equipment, and Catalyst)

for the TSSS for the OEC Ivanhoe plant are deemed to be ongoing. Therefore the Period of Exclusivity is extended to April 9, 2018.

d.  If the agreements (License, Engineering, Equipment and Catalyst) for the TSSS for the OEC Ivanhoe project become effective on or before April 9, 2018, the Period of Exclusivity shall end on December 31, 2020;

e.  If agreements for a second TSSS (other than for the Ivanhoe plant) become effective within the Period of Exclusivity (as referenced in sub-clause 4 (d), the Period of Exclusivity will be extended to March 31, 2024;

f.  If agreements for subsequent (3rd, 4th and 5th) TSSS for additional OEC projects become effective during a then current Period of Exclusivity, the Period of Exclusivity shall extend with each such additional TSSS project by two (2) additional years to the date of the then valid Period of Exclusivity.

If Haldor Topsøe A/S is in agreement with the above, please indicate your acceptance by signing and returning one copy of this letter to me.

Very truly yours,

Jack L. Clem
Chief Executive Officer
Orion Engineered Carbons GmbH

Understood and agreed to this _6_ day of _April_, 2018.

**Haldor Topsøe A/S**

By: _____

Name: ___Morten Schaldemose___
       ___Executive VP, Refinery___

Title: _____

Date: _6. April 2018_

## ENDORSEMENT BY HALDOR TOPSOE, INC.

We, Haldor Topsoe, Inc., confirm that we have read and understood this Agreement and hereby take the same obligations as Haldor Topsøe A/S has undertaken under this Agreement.

Page 3 of 4

Haldor Topsoe, Inc.

By: _____

Name: ____Anders N. Olsen_____

Title: ____Chief Executive Officer____

Date: ____April 5, 2018_____



Appendix V-1





Appendix V-2

Appendix V-3





Appendix V-4





Appendix V-5





Appendix V-6



Appendix V-7



Appendix V-8



Appendix V-9



Appendix V-10





Appendix V-11



Appendix V-12

## APPENDIX VI

## METHOD 8

*While we have taken steps to ensure the accuracy of this Internet version of the document, it is not the official version. Please refer to the official version in the FR publication, which appears on the Government Printing Office's eCFR website:*
http://www.ecfr.gov/cgi-bin-text-idx?SID=c7836e6ff67e5ad001bcb19ccfd99c1a&node=40:8.0.1.1.1&rgn=div5#40:8.0.1.1.1.0.1.1.4

**METHOD 8——DETERMINATION OF SULFURIC ACID AND SULFUR DIOXIDE EMISSIONS FROM STATIONARY SOURCES**

NOTE: This method does not include all of the specifications (*e.g.*, equipment and supplies) and procedures (*e.g.*, sampling and analytical) essential to its performance. Some material is incorporated by reference from other methods in this part. Therefore, to obtain reliable results, persons using this method should have a thorough knowledge of at least the following additional test methods: Method 1, Method 2, Method 3, Method 5, and Method 6.

*1.0 Scope and Application*

1.1 Analytes.

| Analyte | CAS No. | Sensitivity |
|---|---|---|
| Sulfuric acid, including: Sulfuric acid ($H_2SO_4$) mist, Sulfur trioxide ($SO_3$) | 7664-93-9, 7449-11-9 | $0.05$ mg/m$^3$ ($0.03 \times 10^{-7}$ lb/ft$^3$). |
| Sulfur dioxide ($SO_2$) | 7449-09-5 | $1.2$ mg/m$^3$ ($3 \times 10^{-9}$ lb/ft$^3$). |

1.2 Applicability. This method is applicable for the determination of $H_2SO_4$ (including $H_2SO_4$ mist and $SO_3$) and gaseous $SO_2$ emissions from stationary sources.

NOTE: Filterable particulate matter may be determined along with $H_2SO_4$ and $SO_2$ (subject to the approval of the Administrator) by inserting a heated glass fiber filter between the probe and isopropanol impinger (see section 6.1.1 of Method 6). If this option is chosen, particulate analysis is gravimetric only; sulfuric acid is not determined separately.

1.3 Data Quality Objectives. Adherence to the requirements of this method will enhance the quality of the data obtained from air pollutant sampling methods.

*2.0 Summary of Method*

A gas sample is extracted isokinetically from the stack. The $H_2SO_4$ and the $SO_2$ are separated, and both fractions are measured separately by the barium-thorin titration method.

*3.0 Definitions [Reserved]*

*4.0 Interferences*

4.1 Possible interfering agents of this method are fluorides, free ammonia, and dimethyl aniline. If any of these interfering agents is present (this can be determined by knowledge of the process), alternative methods, subject to the approval of the Administrator, are required.

*5.0 Safety*

5.1 Disclaimer. This method may involve hazardous materials, operations, and equipment. This test method may not address all of the safety problems associated with its use. It is the responsibility of the user of this test method to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to performing this test method.

5.2 Corrosive reagents. Same as Method 6, section 5.2.

*6.0 Equipment and Supplies*

6.1 Sample Collection. Same as Method 5, section 6.1, with the following additions and exceptions:

6.1.1 Sampling Train. A schematic of the sampling train used in this method is shown in Figure 8-1; it is similar to the Method 5 sampling train, except that the filter position is different, and the filter holder does not have to be heated. See Method 5, section 6.1.1, for details and guidelines on operation and maintenance.

6.1.1.1 Probe Liner. Borosilicate or quartz glass, with a heating system to prevent visible condensation during sampling. Do not use metal probe liners.

6.1.1.2 Filter Holder. Borosilicate glass, with a glass frit filter support and a silicone rubber gasket. Other gasket materials (*e.g.,* Teflon or Viton) may be used, subject to the approval of the Administrator. The holder design shall provide a positive seal against leakage from the outside or around the filter. The filter holder shall be placed between the first and second impingers. Do not heat the filter holder.

6.1.1.3 Impingers. Four, of the Greenburg-Smith design, as shown in Figure 8-1. The first and third impingers must have standard tips. The second and fourth impingers must be modified by replacing the insert with an approximately 13-mm (½ - in.) ID glass tube, having an unconstricted tip located 13 mm (½ in.) from the bottom of the impinger. Similar collection systems, subject to the approval of the Administrator, may be used.

6.1.1.4 Temperature Sensor. Thermometer, or equivalent, to measure the temperature of the gas leaving the impinger train to within 1 °C (2 °F).

6.2 Sample Recovery. The following items are required for sample recovery:

6.2.1 Wash Bottles. Two polyethylene or glass bottles, 500-ml.



6.2.2 Graduated Cylinders. Two graduated cylinders (volumetric flasks may be used), 250-ml, 1-liter.

6.2.3 Storage Bottles. Leak-free polyethylene bottles, 1-liter size (two for each sampling run).

6.2.4 Trip Balance. 500-g capacity, to measure to ±0.5 g (necessary only if a moisture content analysis is to be done).

6.3 Analysis. The following items are required for sample analysis:

6.3.1 Pipettes. Volumetric 10-ml, 100-ml.

6.3.2 Burette. 50-ml.

6.3.3 Erlenmeyer Flask. 250-ml (one for each sample, blank, and standard).

6.3.4 Graduated Cylinder. 100-ml.

6.3.5 Dropping Bottle. To add indicator solution, 125-ml size.

*7.0 Reagents and Standards*

NOTE: Unless otherwise indicated, all reagents are to conform to the specifications established by the Committee on Analytical Reagents of the American Chemical Society, where such specifications are available. Otherwise, use the best available grade.

7.1 Sample Collection. The following reagents are required for sample collection:

7.1.1 Filters and Silica Gel. Same as in Method 5, sections 7.1.1 and 7.1.2, respectively.

7.1.2 Water. Same as in Method 6, section 7.1.1.

7.1.3 Isopropanol, 80 Percent by Volume. Mix 800 ml of isopropanol with 200 ml of water.

NOTE: Check for peroxide impurities using the procedure outlined in Method 6, section 7.1.2.1.

7.1.4 Hydrogen Peroxide ($H_2O_2$), 3 Percent by Volume. Dilute 100 ml of 30 percent $H_2O_2$) to 1 liter with water. Prepare fresh daily.

7.1.5 Crushed Ice.

7.2 Sample Recovery. The reagents and standards required for sample recovery are:

7.2.1 Water. Same as in section 7.1.2.

7.2.2 Isopropanol, 80 Percent. Same as in section 7.1.3.

7.3 Sample Analysis. Same as Method 6, section 7.3.

*8.0 Sample Collection, Preservation, Storage, and Transport*

8.1 Pretest Preparation. Same as Method 5, section 8.1, except that filters should be inspected but need not be desiccated, weighed, or identified. If the effluent gas can be considered dry (i.e., moisture-free), the silica gel need not be weighed.

8.2 Preliminary Determinations. Same as Method 5, section 8.2.

8.3 Preparation of Sampling Train. Same as Method 5, section 8.3, with the following exceptions:

8.3.1 Use Figure 8-1 instead of Figure 5-1.

8.3.2 Replace the second sentence of Method 5, section 8.3.1 with: Place 100 ml of 80 percent isopropanol in the first impinger, 100 ml of 3 percent $H_2O_2$ in both the second and third impingers; retain a portion of each reagent for use as a blank solution. Place about 200 g of silica gel in the fourth impinger.

8.3.3 Ignore any other statements in section 8.3 of Method 5 that are obviously not applicable to the performance of Method 8.

NOTE: If moisture content is to be determined by impinger analysis, weigh each of the first three impingers (plus absorbing solution) to the nearest 0.5 g, and record these weights. Weigh also the silica gel (or silica gel plus container) to the nearest 0.5 g, and record.)

8.4 Metering System Leak-Check Procedure. Same as Method 5, section 8.4.1.

8.5 Pretest Leak-Check Procedure. Follow the basic procedure in Method 5, section 8.4.2, noting that the probe heater shall be adjusted to the minimum temperature required to prevent condensation, and also that verbiage such as "***plugging the inlet to the filter holder***" found in section 8.4.2.2 of Method 5 shall be replaced by "***plugging the inlet to the first impinger***". The pretest leak-check is recommended, but is not required.

8.6 Sampling Train Operation. Follow the basic procedures in Method 5, section 8.5, in conjunction with the following special instructions:

8.6.1 Record the data on a sheet similar to that shown in Figure 8-2 (alternatively, Figure 5-2 in Method 5 may be used). The sampling rate shall not exceed 0.030 $m^3$/min (1.0 cfm) during the run. Periodically during the test, observe the connecting line between the probe and first impinger for signs of condensation. If condensation does occur, adjust the probe heater setting upward to the minimum temperature required to prevent condensation. If component changes become necessary during a run, a leak-check shall be performed immediately before each change, according to the procedure outlined in section 8.4.3 of Method 5 (with appropriate modifications, as mentioned in section 8.5 of this method); record all leak rates. If the leakage rate(s) exceeds the specified rate, the tester shall either void the run or plan to correct the sample volume as outlined in section 12.3 of Method 5. Leak-checks immediately after component changes are recommended, but not required. If these leak-checks are performed, the procedure in section 8.4.2 of Method 5 (with appropriate modifications) shall be used.



8.6.2 After turning off the pump and recording the final readings at the conclusion of each run, remove the probe from the stack. Conduct a post-test (mandatory) leak-check as outlined in section 8.4.4 of Method 5 (with appropriate modifications), and record the leak rate. If the post-test leakage rate exceeds the specified acceptable rate, either correct the sample volume, as outlined in section 12.3 of Method 5, or void the run.

8.6.3 Drain the ice bath and, with the probe disconnected, purge the remaining part of the train by drawing clean ambient air through the system for 15 minutes at the average flow rate used for sampling.

NOTE: Clean ambient air can be provided by passing air through a charcoal filter. Alternatively, ambient air (without cleaning) may be used.

8.7 Calculation of Percent Isokinetic. Same as Method 5, section 8.6.

8.8 Sample Recovery. Proper cleanup procedure begins as soon as the probe is removed from the stack at the end of the sampling period. Allow the probe to cool. Treat the samples as follows:

8.8.1 Container No. 1.

8.8.1.1 If a moisture content analysis is to be performed, clean and weigh the first impinger (plus contents) to the nearest 0.5 g, and record this weight.

8.8.1.2 Transfer the contents of the first impinger to a 250-ml graduated cylinder. Rinse the probe, first impinger, all connecting glassware before the filter, and the front half of the filter holder with 80 percent isopropanol. Add the isopropanol rinse solution to the cylinder. Dilute the contents of the cylinder to 225 ml with 80 percent isopropanol, and transfer the cylinder contents to the storage container. Rinse the cylinder with 25 ml of 80 percent isopropanol, and transfer the rinse to the storage container. Add the filter to the solution in the storage container and mix. Seal the container to protect the solution against evaporation. Mark the level of liquid on the container, and identify the sample container.

8.8.2 Container No. 2.

8.8.2.1 If a moisture content analysis is to be performed, clean and weigh the second and third impingers (plus contents) to the nearest 0.5 g, and record the weights. Also, weigh the spent silica gel (or silica gel plus impinger) to the nearest 0.5 g, and record the weight.

8.8.2.2 Transfer the solutions from the second and third impingers to a 1-liter graduated cylinder. Rinse all connecting glassware (including back half of filter holder) between the filter and silica gel impinger with water, and add this rinse water to the cylinder. Dilute the contents of the cylinder to 950 ml with water. Transfer the solution to a storage container. Rinse the cylinder with 50 ml of water, and transfer the rinse to the storage container. Mark the level of liquid on the container. Seal and identify the sample container.

*9.0 Quality Control*

9.1 Miscellaneous Quality Control Measures.

| Section | Quality control measure | Effect |
|---------|------------------------|--------|
| 7.1.3 | Isopropanol check | Ensure acceptable level of peroxide impurities in isopropanol. |
| 8.4, 8.5, 10.1 | Sampling equipment leak-check and calibration | Ensure accurate measurement of stack gas flow rate, sample volume. |
| 10.2 | Barium standard solution standardization | Ensure normality determination. |
| 11.2 | Replicate titrations | Ensure precision of titration determinations. |

9.2 Volume Metering System Checks. Same as Method 5, section 9.2.

*10.0 Calibration and Standardization*

10.1 Sampling Equipment. Same as Method 5, section 10.0.

10.2 Barium Standard Solution. Same as Method 6, section 10.5.

*11.0 Analytical Procedure*

11.1 Sample Loss. Same as Method 6, section 11.1.

11.2 Sample Analysis.

11.2.1 Container No. 1. Shake the container holding the isopropanol solution and the filter. If the filter breaks up, allow the fragments to settle for a few minutes before removing a sample aliquot. Pipette a 100-ml aliquot of this solution into a 250-ml Erlenmeyer flask, add 2 to 4 drops of thorin indicator, and titrate to a pink endpoint using 0.0100 N barium standard solution. Repeat the titration with a second aliquot of sample, and average the titration values. Replicate titrations must agree within 1 percent or 0.2 ml, whichever is greater.

11.2.2 Container No. 2. Thoroughly mix the solution in the container holding the contents of the second and third impingers. Pipette a 10-ml aliquot of sample into a 250-ml Erlenmeyer flask. Add 40 ml of isopropanol, 2 to 4 drops of thorin indicator, and titrate to a pink endpoint using 0.0100 N barium standard solution. Repeat the titration with a second aliquot of sample, and average the titration values. Replicate titrations must agree within 1 percent or 0.2 ml, whichever is greater.

11.2.3 Blanks. Prepare blanks by adding 2 to 4 drops of thorin indicator to 100 ml of 80 percent isopropanol. Titrate the blanks in the same manner as the samples.

*12.0 Data Analysis and Calculations*

Carry out calculations retaining at least one extra significant figure beyond that of the acquired data. Round off figures after final calculation.

*12.1 Nomenclature.* Same as Method 5, section 12.1, with the following additions and exceptions:

$C_{H2SO4}$ = Sulfuric acid (including $SO_3$) concentration, g/dscm (lb/dscf).

$C_{SO2}$ = Sulfur dioxide concentration, g/dscm (lb/dscf).

N = Normality of barium perchlorate titrant, meq/ml.

$V_a$ = Volume of sample aliquot titrated, 100 ml for $H_2SO_4$ and 10 ml for $SO_2$.

$V_{soln}$ = Total volume of solution in which the sample is contained, 1000 ml for the $SO_2$ sample and 250 ml for the $H_2SO_4$ sample.

$V_t$ = Volume of barium standard solution titrant used for the sample, ml.

$V_{tb}$ = Volume of barium standard solution titrant used for the blank, ml.

12.2 Average Dry Gas Meter Temperature and Average Orifice Pressure Drop. See data sheet (Figure 8-2).

12.3 Dry Gas Volume. Same as Method 5, section 12.3.

12.4 Volume of Water Vapor Condensed and Moisture Content. Calculate the volume of water vapor using Equation 5-2 of Method 5; the weight of water collected in the impingers and silica gel can be converted directly to milliliters (the specific gravity of water is 1 g/ml). Calculate the moisture content of the stack gas ($B_{ws}$) using Equation 5-3 of Method 5. The note in section 12.5 of Method 5 also applies to this method. Note that if the effluent gas stream can be considered dry, the volume of water vapor and moisture content need not be calculated.

12.5 Sulfuric Acid Mist (Including $SO_3$) Concentration.

$$C_{H_2SO_4} = K_3 \left[ N \left( V_t - V_{tb} \right) \left( V_{soln}/V_a \right) \right] / V_{m(std)} \qquad Eq.\ 8\text{-}1$$

Where:

$K_3$ = 0.04904 g/meq for metric units,

$K_3$ = $1.081 \times 10^{-4}$ lb/meq for English units.

12.6 Sulfur Dioxide Concentration.

$$C_{SO_2} = K_4 \left[ N \left( V_t - V_{tb} \right) \left( V_{soln}/V_a \right) \right] / V_{m(std)} \qquad Eq.\ 8\text{-}2$$

Where:



$K_4$=0.03203 g/meq for metric units,

$K_4$=7.061 × 10⁻⁵ lb/meq for English units.

12.7 Isokinetic Variation. Same as Method 5, section 12.11.

12.8 Stack Gas Velocity and Volumetric Flow Rate. Calculate the average stack gas velocity and volumetric flow rate, if needed, using data obtained in this method and the equations in sections 12.6 and 12.7 of Method 2.

*13.0 Method Performance*

13.1 Analytical Range. Collaborative tests have shown that the minimum detectable limits of the method are 0.06 mg/m³(4 × 10⁻⁹ lb/ft³) for $H_2SO_4$ and 1.2 mg/m³ (74 × 10⁻⁹ lb/ft³) for $SO_2$. No upper limits have been established. Based on theoretical calculations for 200 ml of 3 percent $H_2O_2$ solution, the upper concentration limit for $SO_2$ in a 1.0 m³ (35.3 ft³) gas sample is about 12,000 mg/m³ (7.7 × 10⁻⁴ lb/ft³). The upper limit can be extended by increasing the quantity of peroxide solution in the impingers.

*14.0 Pollution Prevention [Reserved]*

*15.0 Waste Management [Reserved]*

*16.0 References*

Same as section 17.0 of Methods 5 and 6.

*17.0 Tables, Diagrams, Flowcharts, and Validation Data*





Figure 8-1.   Sulfuric Acid Sampling Train

Figure 8-2. Field Data Sheet.

Plant ........................................
Location ........................................
Operator ........................................
Date ........................................
Run No. ........................................
Sample box No. ........................................
Meter box No. ........................................
Meter ΔH@ ........................................
C factor ........................................
Pitot tube coefficient, $C_p$ ........................................

Ambient temperature ........................................
Barometric pressure ........................................
Assumed moisture, % ........................................
Probe length, (ft.) ........................................
Nozzle identification No. ........................................
Average calibrated nozzle diameter, (in.) ........................................
Probe heater setting ........................................
Leak rate, (cfm) ........................................
Static pressure, (in. Hg) ........................................
Probe liner material ........................................
Filter No. ........................................

SCHEMATIC OF STACK
CROSS SECTION

| Traverse point number | Sampling time | Vacuum | Stack temperature | Velocity head | Pressure differential across orifice meter | Gas meter reading | Gas sample temperature at dry gas meter | | Filter temperature | Temperature of gas leaving condenser or last impinger |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | $(\Delta P_s)$ | | | Inlet | Outlet | | |
| | min. | (in.Hg) | $(T_s)(°F)$ | (in. $H_2O$) | (in. $H_2O$) | $(\Delta V)$ | $(°F)$ | $(°F)$ | $(°F)$ | $(°F)$ |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Total | | | | | | | Avg. | Avg. | | |
| Average | | | | | | | Avg. | | | |



## Appendix VII

- Daniel Horn

- Ralf Bergstrasser

- Donnie Loubiere

- A.D. Wilcox

- Russell Webb

- Stephen Saunders

- Mark Peters

- Sathyanarayan [Sam] Mohan

- Rodney Taylor

- _____

2019-69832 / Court: 151

# Exhibit B



**TOKAI CARBON CB**
Building a Future of Technology and Trust

**201 Main Street, Suite 3000**
**Fort Worth, TX 76102**

May 13, 2019

Director, Air Enforcement Division                 Director of Litigation
U.S. Environmental Protection Agency               Litigation Division, MC-175
MC 2242A                                           Texas Commission on Environmental Quality
1200 Pennsylvania Ave. NW                          P.O. Box 13087
Washington, D.C. 20460                             Austin, TX 78711-3087

Cheryl Seager                                      Division Chief
Director                                           Environmental Protection Division
Compliance Assurance and Enforcement Division      Office of the Attorney General of Texas
U.S. Environmental Protection Agency, Region 6     P.O. Box 12548, MC 066
1445 Ross Ave.                                     Austin, TX 78711-2548
Dallas, TX 75202-2733

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C.  20044-7611

Re:  **Tokai Carbon CB**
     **Borger Plant – Alternative Control Technology**

Dear Sir/Madame:

Per Provision 19 of Civil Action No. 3:17-cv-01792-SDD-RLB, Tokai Carbon CB hereby submits the enclosed alternative control technology specifications for your review and approval.  This alternative technology is the Wet Sulfuric Acid (WSA) Process that will remove $SO_2$ emissions from the flue gas emitted by the Boilers.  The enclosed specifications detail the overall pollution control system, which includes the SCR for the NOx removal.  With this submission, please disregard the specifications for the pollution control system that we submitted to you on January 3, 2019.

In addition, we would like to provide you with responses to questions that we received from Mr. Eli Quinn in an email dated February 8, 2019 regarding this control technology.

1.  A revised design analysis demonstrating that the alternative pollution control system is capable of meeting the 7 day rolling average limits pursuant to the CD based on design/maximum, normal, and minimum weekly (7 day) tail gas flow rates.  The current design proposal addresses the 365 day rolling average pollutant emission limits required by the CD, however, the 7 day rolling average pollutant emission limits are not explicitly addressed in the proposal.

    The alternative pollution control system will be able to meet both the 7-day and 365- day rolling average limits. We have updated the design proposal to address both limits.

    Please see Attachment 1- Process Specification – Borger Pollution Controls_Rev3, Page 01, Section Titled "Justification/Benefits"
    Please see Attachment 1 - Process Specification – Borger Pollution Controls_Rev3, Page 02, Lines 71 to Lines 79.

2.  A comparison of historical tail gas flow rates for the past 10 years against the design/maximum, normal, and minimum yearly (365 day) and weekly (7 day) tail gas flow rates used in the design analysis.

Please see enclosed graph in Attachment 2. The graph shows a comparison between the design flows and the historical trends.

3.  A high-level construction schedule that demonstrates that the project will meet dates/deadlines pursuant to the CD.

Please see Attachment 3 - Borger CD Schedule 11-17-18 "Original Schedule" before patent issues.
Please see Attachment 3 - Borger CD Schedule 4-3-19 for discussion with EPA during meeting.

4.  An updated objective referencing the 365 day and 7 day rolling average limits, and consent decree deadlines.

Please see Attachment 1 - Process Specification – Borger Pollution Controls_Rev3, Page 01
Please see Attachment 1- Process Specification – Borger Pollution Controls_Rev3, Page 02, Lines 71 to Lines 79.

5.  Revised Process Block Diagram showing separate blocks for the SCR, SO2 Converter, and PM removal system.

Please see Attachment 1- Process Specification – Borger Pollution Controls_Rev3, Page 03, Process Flow Diagram

6.  A revised Process Description that includes descriptions for the SCR, SO2 Converter, WSA Condenser, and PM removal system; include the chemical reactions that take place during each stage.

Please see Attachment 1– Process Specification - Borger Pollution Controls_Rev3, Page 01, Section Titled "Process Description.
Please see Attachment 1– Process Specification – Borger Pollution Controls_Rev3, Page 03, Process Flow Diagram

Sincerely,

Long Nguyen
Environmental, Health & Safety Manager

# Attachment 1

| TOKAI CARBON CB *Building a Future of Technology and Trust* | PROCESS SPECIFICATION |
|---|---|
| Project Name | Borger Boilers SCR and Wet Sulfuric Acid Process |
| Plant/Area | Borger Plant – Boilers |
| Date | 04/04/2019 |
| Rev | 03 |

| Project Name: | **Borger Boilers SCR and Wet Sulfuric Acid Process** |
|---|---|
| Objective | To install a selective catalytic reactor (SCR) and a Wet Sulfuric Acid (WSA) process downstream of the existing boilers at the Borger Plant. The equipment shall be designed to meet the emission limits and timelines mandated by the consent decree (CD) with the EPA. |
| Justification/ Benefits | The Borger plant produces carbon black with feedstock oil containing excess sulfur in a high temperature environment. Natural gas combustion is used as the primary source of heat in the carbon black reactors. The resulting tail gas from the process is partially used in the drying process (30% - 35%). The remaining tail gas (65%-70%) is combusted in two boilers to generate steam for plant consumption and power generation. The consent decree (CD) with the EPA requires that the boilers flue gas be treated for $NO_x$, $SO_2$, and PM emissions<br><br>1.  NOx levels are approximately 300 ppm (dry, at 3% O2) and must be reduced to less than 39 ppm (dry, 0% O2) on a 365-day rolling average and less than 54 ppm (dry, 0% O2) on a 7-day rolling average.<br><br>2.  $SO_2$ levels are approximately 2,660 ppm (dry, at 3% O2) and must be reduced to less than 80 ppm (dry, 0% O2) on a 365-day rolling average and less than 120 ppm (dry, 0% O2) on a 7-day rolling average.<br><br>3.  Particulate Matter discharge from the final stack must be maintained below 0.0069 grains/dscf (EPA Method 5 Filterable PM) on a 3-hour average basis.<br><br>Refer to attached process flow diagram and data sheet. |
| Yield/Production | Will increase the cost of production of carbon black |
| Quality | No impact on quality |
| Environmental | Reduce the environmental impact of emissions from the Plant. |
| Process Description | 1.  Tubes will be removed from the existing boilers (de-rating) to achieve a flue gas exit temperature of 650 °F.<br>2.  A common flue gas header will be retrofitted at the existing boilers stack and tied into the new SCR reactor.<br>3.  Two ID fans will be installed to convey all plant's flue gas. VFDs or inlet dampeners to be installed.<br>4.  A duct burner (~25-30 MMBtu/hr.) will be installed to adjust the flue gas temperature to ~750 deg F before the SCR.<br>5.  19%- Ammonia, NH3, will be evaporated, diluted with air, injected and properly mixed into the flue gas stream.<br>6.  The flue gas will enter an SCR where ~90% of the NOx will react with NH3 to produce N2 and H2O ( Reaction 1.0)<br>7.  Next, the flue gas will enter the WSA catalytic beds where ~99% of the $SO_2$ will be oxidized to $SO_3$ (Reaction 2.0)<br>8.  The exothermic reaction of $SO_2$ to $SO_3$ will increase the flue gas temperature by close to ~10 deg F.<br>9.  A gas cooler (boiler) will be installed at the discharge of the SO2/SO3 reactor to cool the flue gas down to ~500 °F<br>10. 500 psig saturated steam will be made at the gas cooler. This steam will be merged with the existing boilers steam, sent through the existing superheater tubes, and used for power generation and plant consumption.<br>11. The boiler feed water for the process gas cooler will be supplied by the existing boiler feed water pumps<br>12. The flue gas will enter the WSA condenser where all the $SO_3$ is condensed into 90% sulfuric acid (Reaction 3.0).<br>13. A small silicone oil burner (50-100 g/hr) will be installed upstream of the condenser to promote acid condensation.<br>14. Cooling air (or any other suitable media) will be used to lower the WSA condenser where the flue gas temperature to the acid dew point.<br>15. Hot air from the acid condenser will be used at the duct burner, the ammonia system, and the acid concentrator.<br>16. Any excess hot air will be routed to a safe location for discharge or any other general use.<br>17. The sulfuric acid will be further concentrated to at least 93% in an acid concentrator tower.<br>18. A water-cooled heat exchanger will cool the sulfuric acid down to ~100 deg F before sending it to storage tanks<br>19. 3 storage tanks will be installed to hold in-spec sulfuric acid, off-spec sulfuric acid, and blending acid respectively.<br>20. A loading terminal will be constructed to load, unload, and weight trucks (unload for blending tank) for sulfuric acid<br>21. The flue gas exiting the acid condenser will be routed to a stack. Droplet and mist eliminators will be installed prior to the stack. |
| Safety | Appropriate HAZOP and safety reviewed will be conducted prior to the start of the project. Operating procedures will be developed and operators trained in the safe operation of the equipment |
| MOC | Will an MOC be required (Refer MOC Procedure)? Yes – To be done during the AFE approval process |

**Approvals: Plant Manager, Process Eng. Manager, Eng. Director, Manufacturing Director, VP – Production & Eng. via Redmine**

| Line# | PROCESS DESIGN SPECIFICATION - CORPORATE ENGINEERING | | | | | | | TOKAI CARBON CB | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | BORGER BOILERS - POLLUTION CONTROLS DESIGN SPECIFICATIONS | | | | | | | Building a Future of Technology and Trust | |
| 2 | Rev 3 | | | | | | | | |
| 3 | Average Tail Gas Composition to Burners | | Design | Minimum | | | | COMMENTS | |
| 4 | H2O | % | 49.21% | 47.27% | | | | | |
| 5 | N2 | % | 32.41% | 33.65% | | | | | |
| 6 | H2 | % | 7.96% | 8.27% | | | | | |
| 7 | H2S | % | | NOTE 1 | | | | | |
| 8 | Arg/O2 | % | 0.38% | 0.39% | | | | | |
| 9 | CH4 | % | 0.22% | 0.23% | | | | | |
| 10 | CO | % | 7.32% | 7.60% | | | | | |
| 11 | CO2 | % | 2.10% | 2.18% | | | | | |
| 12 | C2H2 | % | 0.41% | 0.42% | | | | | |
| 13 | Total | % | 100.00% | 100.00% | | | | | |
| 14 | Tail Gas Flows | | | | | | | | |
| 15 | Total Tail Gas Generated | SCFH | 9,252,717 | 1,847,123 | | | | | |
| 16 | | Nm3/hr | 247,689 | 49,466 | | | | | |
| 17 | % Tail Gas to Boiler | % | 70% | 65% | | | | | |
| 18 | Tail Gas Flow available to boilers | SCFH | 6,476,902 | 1,200,630 | | | | | |
| 19 | | Nm3/hr | 173,623 | 32,166 | | | | | |
| 20 | Reheat Natural Gas | SCFH | 25,000 | 4,684 | | | | | |
| 21 | | Nm3/hr | 670 | 125 | - | | | | |
| 23 | Lines 29 to 70 correspond to Stream No 06 in Process Flow Diagram | | | | 3670870.012 | 780409.4901 | | | |
| 24 | | | MAX BOILERS CONDITIONS | | DESIGN/MAX CONDITIONS | NORMAL CONDITIONS | MINIMUM CONDITIONS | | |
| 25 | | | | | | | | | |
| 26 | | | | | | | | | |
| 27 | Tail Gas to Boilers- wet ( Stream No 1 in PFD) | SCFH | 6,476,902 | | 6,476,902 | 5,847,462 | 1,200,630 | | |
| 28 | Sulfur in Oil | % Wt | 4.0% | | 4.0% | 2.5% | 2.5% | | |
| 29 | Flue Gas Flow From Boilers- Wet (Stream No 4 in PFD) | SCFH | 10,243,599 | | 10,243,599 | 8,931,640 | 1,979,301 | <--- Minimum flow based on Unit 1 In Operation | |
| 30 | | ACFH | 170,727 | | 170,727 | 148,964 | 32,988 | | |
| 31 | | Nm3/hr | 274,436 | | 274,436 | 239,293 | 53,027 | | |
| 32 | | | | | | | | | |
| 33 | Flue Gas Temp ( Boilers Discharge) ( Stream No 4 in PFD) | oF | 650 | | 650 | 650 | 650 | <--- Boiler Tubes Reduced to achieve 650 oF at discharge | |
| 34 | | oC | 343 | | 343 | 343 | 343 | <--- Duct Burner will increase temp at SCR Reactor Inlet | |
| 35 | Flue Gas Pressure ( Boilers Discharge) ( Stream No 4) | barG | 0.0 | | 0.0 | 0.0 | 0.0 | <--- Typical fluctuation in pressure is 0 to -1 inH2Og | |
| 36 | | | | | | | | | |
| 38 | Actual Flue Gas From Stack (Wet) - NOTE 2 | ACFH | 21,866,145 | | 21,866,145 | 19,086,043 | 4,226,047 | | |
| 39 | | ACFM | 364,436 | | 364,436 | 317,767 | 70,417 | | |
| 40 | | m3/hr | 619,180 | | 619,180 | 539,980 | 119,640 | | |
| 41 | | | | | | | | | |
| 42 | Flue Gas Composition - % Wet | | | | | | | | |
| 43 | H2O | | 38.7% | | 38.7% | 36.2% | 35.7% | <--- Typical fluctuation in H2O is 32% to 40% | |
| 44 | N2 | | 53.5% | | 53.5% | 53.9% | 54.7% | | |
| 45 | Arg | | 0.2% | | 0.2% | 0.2% | 0.2% | | |
| 46 | CO2 | | 6.6% | | 6.6% | 6.7% | 6.6% | | |
| 47 | O2 | | 3.0% | | 3.0% | 3.0% | 3.0% | <--- Typical fluctuation in O2% are 2% to 4% | |
| 48 | Total | | 100.0% | | 100.0% | 100.0% | 100.0% | | |
| 49 | | | | | | | | | |
| 50 | Flue Gas Flow -Dry Basis | SCFH | 6,465,766 | | 6,465,766 | 5,699,903 | 1,290,642 | | |
| 51 | Flue Gas Flow Composition % -Dry Basis | N2 | 84.4% | | 84.4% | 84.0% | 84.9% | | |
| 52 | | Arg | 0.4% | | 0.4% | 0.4% | 0.4% | | |
| 53 | | CO2 | 10.4% | | 10.4% | 10.5% | 10.3% | | |
| 54 | | O2 | 4.8% | | 4.8% | 4.6% | 4.7% | | |
| 55 | | | | | | | | | |
| 56 | UNTREATED POLLUTANTS BREAKDOWN | | | | | | | | |
| 57 | NOTE 1) | | BOILERS PPM (Dry) | | TOTAL PPM (Dry) | TOTAL PPM (Dry) | TOTAL PPM (Dry) | | |
| 58 | NOx (dry at given O2% ) | PPM | 300 | | 300 | 300 | 300 | | |
| 59 | SO2 (dry at given O2% ) | PPM | 2,660 | | 2,660 | 1,350 | 687 | | |
| 60 | SO3 ( dry at given O2%) | PPM | 15.0 | | 15.00 | 15.00 | 14.68 | | |
| 61 | Design Inlet PM Loading | grains/dscf | 0.020 | | 0.02 | 0.02 | 0.02 | <--- EPA Method 05 Filterable PM (For Design ONLY) | |
| 62 | Design Inlet PM Loading | mg/Nm3(dry) | 48.4 | | 48.42 | 48.42 | 48.42 | <--- EPA Method 05 Filterable PM (For Design ONLY) | |
| 63 | Design Max Inlet PM during bag failure (<0.5 hrs) | grains/dscf | 1.24 | | 1.24 | 1.24 | 1.24 | <--- Under Bag Failure Conditions Only | |
| 61 | Design Max Inlet PM during bag failure (<0.5 hrs) | mg/Nm3 | 3,000 | | 3,000 | 3,000 | 3,000 | <--- Under Bag Failure Conditions Only | |
| 62 | | | BOILERS LB/HR | | TOTAL LB/HR | TOTAL LB/HR | TOTAL LB/HR | | |
| 63 | | | | | | | | | |
| 64 | NOx | LBS/HR | 236 | | 236 | 207 | 46 | | |
| 65 | SO2 | LBS/HR | 2,910 | | 2,910 | 1,298 | 148 | | |
| 66 | SO3 | LBS/HR | 21 | | 20.5 | 18.0 | 4.0 | | |
| 67 | | | | | | | | | |
| 68 | Consent Decree Requirements | | | | | | | | |
| 69 | | | | | | | | | |
| 71 | 365-day Rolling Average, NOx outlet, ppm (dry) @ 0% O2 - less than | | | | 30 | 30 | 30 | | |
| 74 | 7-day Rolling Average, NOx outlet, ppm (dry) @ 0% O2 - less than | | | | 54 | 54 | 54 | | |
| 75 | 365-day Rolling Average, SO2 outlet, ppm (dry) @ 0% O2 - less than | | | | 80 | 80 | 80 | | |
| 77 | 7-day Rolling Average, SO2 outlet, ppm (dry) @ 0% O2 - less than | | | | 120 | 120 | 120 | | |
| 78 | PM emissions at final stack , grains/dscf - less than | | | | 0.0098 | 0.0098 | 0.0098 | <--- on a 3-hr average | |
| 79 | PM emissions at final stack , mg/Nm3(dry) - less than | | | | 16.70 | 16.70 | 16.70 | <--- on a 3-hr average | |
| 80 | Ammonia Slip at final stack ppm(dry) @ 3% O2 - less than | | | | 10.0 | 10.0 | 10.0 | <--- State Requirement | |
| 81 | SO3 emissionsat final stack ppm(dry) @ 0% O2 - less than | | | | 10.0 | 10.0 | 10.0 | | |
| 82 | | | | | | | | | |
| 83 | NOTES | | | | | | | | |
| 84 | 1) H2S in the tail gas converts to SO2 after combustion. This typically varies with the %S in the feedstock oil. | | | | | | | | |
| 85 | Worst case scenario of 4% S in the feedstock. Normal and min cases are based on 2.5% sulfur | | | | | | | | |
| 86 | 2) Actual conditions corrected for temperature. Actual pressure assumed to be at 1 atm | | | | | | | | |
| 88 | APPROVALS: | | | | | | | | |
| 89 | | | R. Ali | L. Nguyen | A. J. Bahr | P. Pitmann | S. Hones | R. Bismilla | |



**Untreated NOX and SO2**

| Stream | Pollutant | lbs/hr | PPM dry |
|--------|-----------|--------|---------|
| 4 | NOX | 236 | 24 |
| 4 | SO2 | 2,910 | 24 |
| | | | |
| | | | |

**English Units**

| Stream # | Descrip. | Max Flow MSCFH | Press inWC | Temp degF |
|----------|----------|----------------|------------|-----------|
| 1 | Tail Gas | 6,477 | 24 | 450 |
| 2 | Air | 4,210 | 24 | 80 |
| 3 | Nat Gas | 0 | --- | --- |
| 4 | Flue Gas | 10,244 | 0 | 650 |
| 5 | Flue Gas | 10,519 | 0 | 750 |
| 6 | Flue Gas | 10,519 | 30 | 750 |
| | | | | |

**SI Units**

| Stream | Descrip. | Max Flow Nm3/hr | Press mbar g | Temp deg C |
|--------|----------|-----------------|--------------|------------|
| 1 | Tail Gas | 173,523 | 60 | 232 |
| 2 | Air | 112,790 | 60 | 27 |
| 3 | Nat Gas | 0 | --- | --- |
| 4 | Flue Gas | 274,436 | 0 | 343 |
| 5 | Flue Gas | 281,814 | 0 | 399 |
| 6 | Flue Gas | 281,814 | 75 | 399 |

**Chemical Reactions**

(1.0) $4NO + 4NH3 + O2 \longrightarrow 4N2 + 6H2O$

(2.0) $SO2 + \frac{1}{2} O2 \longrightarrow SO3$

( 3.0 ) $SO3 + H2O \longrightarrow H2SO4$

**Pollution Controls Design Efficiency**

| | | Stream 10 365-day rolling average | Stream 10 7-day rolling average | Stream 10 3-hr average |
|---|---|---|---|---|
| NOX | ppm dry @ O4O2 | <39 | <54 | --- |
| SO2 | ppm dry @ O4O2 | <80 | <120 | --- |
| PM | grns/dscf | --- | --- | <0.0069 |

**NOTES**

1 TBD= To be determined by Vendor or Balance of Plant Engineeering

2 Boilers to be modified for an outlet flue gas temperature of 650 deg F

3 Natural Gas Duct Burner will bring flue gas temperature to 750 deg F

4 Steam from process gas cooler to be controlled at ~500-550 psig

5 Steam from process gas cooler to be routed to existing boilers superheater

6 Existing Feed Water Pumps, Deaerator, and Condenser to handle all steam

| Date | Rev | Comment | By |
|------|-----|---------|-----|
| 11/1/2018 | 0 | Initial PFD | FA |
| 2/1/2019 | 1 | Final PFD | JG |
| 4/1/2019 | 2 | Final PFD revised | JG |
| 5/10/2019 | 3 | Final PFD_revised | JG |

| Title: | Borger Boilers-Pollution Controls SCR & Wet Sulfuric Acid Process |
|--------|------|
| Rev: | 3 |
| Date: | 5/10/2019 |
| Plant: | Borger Plant |
| Prepared by | Jose Garcia | Date | 2/1/2019 |
| Approved by | Roshan Ali | Date | 2/1/2019 |

# Attachment 2



# Attachment 3

## Original Schedule



## Updated Schedule



1



BORGER NOx/SOx REDUCTION PROJECT
WET SULFURIC ACID TECHNOLOGY

| ID | Task Mode | Task Name | Duration | Start |
|----|-----------|-----------|----------|-------|
| 1 | | **AFE** | 0 days | Mon 4/15/19 |
| 2 | | **Process Design** | 91 days | Mon 4/15/19 |
| 14 | | **DETAIL ENGINEERING DESIGN** | 0 days | Tue 8/20/19 |
| 15 | | **Mechanical** | 105 days | Tue 8/20/19 |
| 16 | | Finalize Equipment Layouts | 60 days | Tue 8/20/19 |
| 26 | | Interconnecting Piping & Duct Work | 55 days | Tue 10/29/19 |
| 29 | | **Civil Structural** | 45 days | Tue 9/17/19 |
| 32 | | **Electrical** | 30 days | Tue 9/24/19 |
| 39 | | **Controls** | 200 days | Tue 8/20/19 |
| 45 | | **EQUIPMENT PROCUREMENT** | 180 days | Tue 9/17/19 |
| 58 | | **ELECTRICL PROCUREMENT** | 160 days | Tue 10/8/19 |
| 61 | | **INSTRUMENT PROCUREMENT** | 120 days | Tue 12/24/19 |
| 64 | | **Programming / HMI** | 240 days | Tue 3/3/20 |
| 69 | | **INSTALLATION** | 330 days | Tue 11/19/19 |
| 70 | | Civil Concrete | 55 days | Tue 11/19/19 |
| 76 | | Equipment Installation | 0 days | Tue 2/4/20 |
| 77 | | Mechanical & Piping | 275 days | Tue 2/4/20 |
| 133 | | Electrical | 200 days | Tue 5/19/20 |
| 142 | | **COMMISIONING** | 30 days | Tue 2/23/21 |
| 147 | | **SYSTEM START-UP** | 0 days | Tue 4/6/21 |
| 148 | | **SYSTEM OPTIMIZATION** | 60 days | Wed 4/7/21 |
| 151 | | **EPA MONITORING READY** | 0 days | Tue 6/29/21 |

Project: Topsoe Schedule
Date: Fri 4/5/19

Legend: Task, Split, Milestone, Summary, Project Summary, External Tasks, External Milestone, Inactive Task, Inactive Milestone, Inactive Summary, Manual Task, Duration-only, Manual Summary Rollup, Manual Summary, Start-only, Finish-only, Deadline, Progress

2019-69832 / Court: 151

# Exhibit C

NO. 1137/2019 -MB-

| | | |
|---|---|---|
| ORION ENGINEERED CARBONS, LLC, and ORION ENGINEERED CARBONS GmbH, | §<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | HARRIS COUNTY, TEXAS |
| HALDOR TOPSOE A/S, HALDOR TOPSOE, INC., and TOKAI CARBON CB LTD. | §<br>§<br>§<br>§ | |
| Defendants. | §<br>§ | _____ JUDICIAL DISTRICT |

## AFFIDAVIT OF RALF BERGSTRAESSER

I, Ralf Bergstraesser, having been duly sworn, state as follows:

1.    I am Manager for Process Development and Innovation for Orion Engineered Carbons, GmbH ("Orion GmbH"), a company organized and existing under the laws of Germany. As Orion GmbH's Manager for Process Development and Innovation, my responsibilities include identifying and implementing process improvements, driving innovation, and supporting business functions for technical evaluation.

2.    I am over twenty-one years of age, of sound mind, capable of making this affidavit, and fully competent to testify to the matters stated herein. I have personal knowledge of the following facts and statements in this affidavit, and they are true and correct. If called as a witness, I could and would testify competently thereto.

3.    I am submitting this affidavit in support of Plaintiffs' Verified Original Petition and Application for Temporary Injunction filed in the above-captioned matter. I was personally involved in the adaptation of WSA technology for use in carbon black production as well as the negotiations and trial testing with HT. I have read the foregoing Plaintiffs' Verified Original

Petition and Application for Temporary Injunction. The facts contained in paragraphs 13 through 39 are within my personal knowledge and are true and correct.

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing Plaintiffs' Verified Original Petition and Application for Temporary Injunction are true.

Ralf Bergstraesser
Manager for Process Development and Innovation for Orion Engineered Carbons, GmbH

Subscribed and sworn to before me

This 24 day of SEPTEMBER, 2019

Notary Public: _____
DR MARKUS BUSCHBAUM

My Commission Expires: 31-03-2046

**<u>Document Register No.</u>**          **<u>1137/ 2019 – MB –</u>**

This is to certify that the above signature was made before me in his own hand by

Dr. Ralf B e r g s t r ä ß e r,
born on 27 March 1977, resident in Elsdorf,
business address Hahnstrasse 49, 60528 Frankfurt,

who identified himself by presenting his German identity card.

Cologne, 24 September 2019


**L. S.**                              **gez. Buschbaum**

                                       (Dr. Markus Buschbaum )
                                       civil law notary

2019-69832 / Court: 151

# Exhibit D

NO. _1135/2019 - MB -_

| | | |
|---|---|---|
| ORION ENGINEERED CARBONS, LLC, and ORION ENGINEERED CARBONS GmbH, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| HALDOR TOPSOE A/S, HALDOR TOPSOE, INC., and TOKAI CARBON CB LTD. | § § § § | |
| Defendants. | § § | _____ JUDICIAL DISTRICT |

## AFFIDAVIT OF DAVID DETERS

I, David Deters, having been duly sworn, state as follows:

1.      I am Chief Technology Officer ("CTO") for Orion Engineered Carbons, GmbH.

2.      I am over twenty-one years of age, of sound mind, capable of making this affidavit, and fully competent to testify to the matters stated herein. I have personal knowledge of the following facts and statements in this affidavit, and they are true and correct. If called as a witness, I could and would testify competently thereto.

3.      I am submitting this affidavit in support of Plaintiffs' Verified Original Petition and Application for Temporary Injunction filed in the above-captioned matter. I have reviewed and am familiar with the NDA, Letter Agreement, and License Agreement as well as their negotiations and terms by virtue of my position with the company and my involvement with Orion's relationship with HT. I have read the foregoing Plaintiffs' Verified Original Petition and Application for Temporary Injunction. The facts contained in paragraphs 40 through 60 are within my personal knowledge and are true and correct.

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing Plaintiffs' Verified Original Petition and Application for Temporary Injunction are true.

David Deters
Chief Technology Officer for Orion
Engineered Carbons GmbH

Subscribed and sworn to before me

This ⟨24⟩ day of SEPTEMBER, 2019

Notary Public: DR MARKUS BUSCHBAUM

My Commission Expires: 31-03-2046

**Document Register No.**          **1135/ 2019 - MB -**

This is to certify that the above signature was made before me in his own hand by

Mr. David D e t e r s ,
born on 20 November 1958, resident in Bonn,
business address Hahnstrasse 49, 60528 Frankfurt,

who identified himself by presenting his German residence permit.

Cologne, 24 September 2019

**L. S.**                              **gez. Buschbaum**

(Dr. Markus Buschbaum )
civil law notary

2019-69832 / Court: 151

# **Exhibit E**

NO. _____

| | | |
|---|---|---|
| ORION ENGINEERED CARBONS, LLC, and ORION ENGINEERED CARBONS GmbH, | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| HALDOR TOPSOE A/S, HALDOR TOPSOE, INC., and TOKAI CARBON CB LTD. | § § § § | |
| Defendants. | § § | _____ JUDICIAL DISTRICT |

## AFFIDAVIT OF CORNING PAINTER

I, Corning Painter, having been duly sworn, state as follows:

1.      I am Chief Executive Officer ("CEO") of Orion Engineered Carbons S.A. (NYSE:OEC) ("Orion S.A.", the parent company of Orion group) and President for Orion Engineered Carbons, LLC ("Orion"), a company organized and existing under the laws of Delaware, having an office at 4501 Magnolia Cove Drive, Suite 106, Kingwood, Texas 77345. As CEO, my responsibilities include providing leadership company wide, making high-level decisions about company policy and strategy, developing and implementing strategic plans, reporting to the board of directors, and acting as the primary spokesperson for the company.

2.      I am over twenty-one years of age, of sound mind, capable of making this affidavit, and fully competent to testify to the matters stated herein. I have personal knowledge of the following facts and statements in this affidavit, and they are true and correct. If called as a witness, I could and would testify competently thereto.

3.      I am submitting this affidavit in support of Plaintiffs' Verified Original Petition and Application for Temporary Injunction filed in the above-captioned matter. I personally met with

Tokai in January, March, and April of 2019 and had other correspondence by phone and email with Tokai on the topics of Orion's License Agreement with HT and potentially extending a license for the same technology to Tokai. I have read the foregoing Plaintiffs' Verified Original Petition and Application for Temporary Injunction. The facts contained in paragraphs 61 through 70 are within my personal knowledge and are true and correct. I further state Exhibits A and B are true and correct copies of the originals as stated in Plaintiffs' Verified Original Petition and Application for Temporary Injunction.

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing Plaintiffs' Verified Original Petition and Application for Temporary Injunction are true.

_____

Corning Painter
Chief Executive Officer of Orion
Engineered Carbons S.A. and President for
Orion Engineered Carbons, LLC

Subscribed and sworn to before me

This _____ day of _____, 2019

Notary Public: _____

My Commission Expires: _____

No. 130 of the Roll of Deeds 2019

I, the undersigned Civil Law Notary Dr. Julian Lemor, duly admitted to practice in Frankfurt am Main, Germany, and having my offices in Friedrich-Ebert-Anlage 35-37, 60327 Frankfurt am Main, Germany, hereby certify that

      Mr. Corning Faber Painter, born on 18 October 1962
      with business address at: 4501 Magnolia Cove Drive, Suite 106
      Kingwood, Texas 77345 (USA)
      who identified himself by his passport

signed the above document in my presence in the offices of Orion Engineered Carbons GmbH, Hahnstr. 49 in 60528 Frankfurt am Main, Germany, where I had been requested to attend.

The question as to a prior involvement within the meaning of Sec. 3 clause 1 no. 7 of the German Notarization Act ("*BeurkG*") was answered in the negative.

Frankfurt am Main, this 24th day of September 2019

Dr. Julian Lemor
Civil Law Notary